Filed 5/14/13  Teimouri v. Macy's, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MEHRNOOSH TEIMOURI,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MACY'S, INC. et al.,<br><br>    Defendants and Appellants. | D060696<br><br><br>(Super. Ct. No.<br> 37-2010-00093577-CU-OE-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Richard E.L. Strauss, Judge.  Reversed.

Law Offices of Julia Azrael, John Slade Curtis, Macy's, Inc., Law Department and Michael C. Christman, David E. Martin and Catherine E. Sison, for Defendants and Appellants.

Initiative Legal Group, Sue Jin Kim, Gene Williams, Raul Perez, Ryan H. Wu, and Monica Balderrama, Capstone Law and Glenn A. Danas for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendants Macy's, Inc. and Macy's West Stores, Inc. (jointly "Macy's") appeal from an order of the trial court denying Macy's motion to compel arbitration of plaintiff Mehrnoosh Teimouri's individual claims, to dismiss Teimouri's class and representative claims, and to stay the action pending arbitration.

Macy's contends that the trial court erred in relying on *Gentry v. Superior Court* (2007) 42 Cal.4th 443 (*Gentry*) to conclude that the class and collective action waiver in the arbitration agreement is unenforceable. Macy's also argues that the trial court erred in denying its motion to dismiss Teimouri's representative claims made pursuant to Labor Code sections 2699 et seq., the Private Attorney General Act (PAGA), because the Federal Arbitration Act (FAA, 9 U.S.C., § 1 et seq.) requires courts to enforce arbitration agreements according to their terms, even where those agreements contain a representative action waiver that would otherwise preclude a representative PAGA claim.

Teimouri defends the trial court's ruling and its analysis of the state of the law with respect to class and collective actions waivers in an arbitration agreement. In addition to defending the trial court's order on the grounds on which the trial court based its decision, Teimouri argues that there are three independent grounds on which this court could affirm the trial court's denial of the motion to compel: (1) Macy's has waived its right to arbitrate these claims; (2) the arbitration agreement is unconscionable and therefore unenforceable; and (3) the arbitration agreement violates the National Labor Relations Act and therefore cannot be enforced.

After considering the parties' contentions and reviewing both federal and state authorities pertaining to these rapidly evolving issues, we conclude that the arbitration agreement between Teimouri and Macy's is enforceable as written. The class and collective action waiver in that agreement precludes Teimouri from bringing any class or representative claims in the arbitration, but Teimouri may pursue her individual claims, including her individual PAGA claims, in an arbitral forum. We therefore reverse the order of the trial court.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

1.    *Macy's dispute resolution program*

Macy's offers a dispute resolution program for employees called "Solutions InSTORE" (InSTORE Program). The InSTORE Program involves four sequential steps: (1) the "Open Door" step in which employees bring their concerns to a supervisor or local management team member for informal resolution; (2) a written request for review to the Office of the Senior Human Resources Management; (3) a request for reconsideration by a panel of peers or by the Office of Solutions InSTORE; and (4) binding arbitration. All employees "agree to be covered by Step 4—Arbitration by accepting or continuing employment with the Company . . . ." However, employees have the option of "exclud[ing] themselves from Arbitration by completing an election form" within 30 days of the date on which the employee is hired by Macy's. A decision to opt out is confidential, and local management is not informed of an employee's decision regarding

3

the opt-out. A decision at any level of the InSTORE Program is binding on Macy's; only the employee has a right to appeal each decision to the next level.

The arbitration agreement that is part of the InSTORE Program covers "all employment-related legal disputes, controversies or claims arising out of, or relating to, employment or cessation of employment, whether arising under federal, state or local decisional or statutory law," except as "otherwise limited" by the terms of the contract. The arbitration agreement provides that it "shall apply to any and all such disputes, controversies or claims whether asserted by the Associate against the Company . . . " or "by the Company against the Associate." The agreement allows the arbitrator "to grant any relief, including costs and attorney's fees, that a court could grant" if the arbitrator finds "that a party has sustained its burden of persuasion in establishing a violation of applicable law . . . ."

An employee who chooses to arbitrate a claim must pay a filing fee equal to one day's base pay or $125, whichever is less. Under the agreement, if an employee consults with an attorney, Macy's will reimburse legal fees of up to $2,500 during each continuously rolling 12-month period, regardless of the outcome of the proceedings. If the employee does not consult an attorney, Macy's will reimburse the employee for incidental costs up to $500 during each rolling 12-month period. Also, if the employee decides not to use the services of an attorney during the arbitration, Macy's agrees to appear for arbitration without the assistance of counsel, as well.

The arbitration agreement provides for limited discovery, including a set of 20 interrogatories and up to three depositions for each party. All discovery must be

4

completed within 90 days of the selection of an arbitrator. The arbitrator has the authority to permit additional discovery. The agreement provides that employees must initiate an arbitration proceeding "in accordance with the time limits contained in the applicable law's statute of limitations," but also provides for tolling of the applicable statute of limitations during the time in which the employee is pursuing the first three steps of the InSTORE Program.

The agreement allows Macy's to alter the Solutions InSTORE rules and procedures, or to cancel the program in its entirety, upon 30 days' written notice to employees.

Of particular importance in the present appeal is a provision of the arbitration agreement that prohibits class or collective arbitration. That provision states:

> "The Arbitrator shall not consolidate claims of different Associates into one (1) proceeding. Nor shall the Arbitrator have the power to hear an arbitration as a class or collective action. (A class or collective action involves representative members of a large group, who claim to share a common interest, seeking relief on behalf of the group.)"

2. *Teimouri's employment with Macy's*

Teimouri was employed as a Macy's sales associate between April 28, 2008 and July 16, 2009. On Teimouri's first day of work, Macy's provided Teimouri with various hiring documents, including a "New Hire Brochure" (Brochure), which describes Macy's InSTORE program. The Brochure provides an overview of the InSTORE program, and includes a "Plan Document" that outlines the rules and procedures of the InSTORE Program in detail. The Brochure explains that arbitration is an option, not a requirement,

and also explains that the employee may opt out of arbitration. The Brochure contains an "Early Dispute Resolution Program Election Form" (Election Form), which states that an employee must opt out of Step 4 of the InSTORE Program—i.e., the arbitration provision—within 30 days of the employee's hire date if he or she does not want to agree to submit employment-related disputes to binding arbitration.

Teimouri electronically confirmed that she received the Brochure, the Plan Document, and the Election Form. There is no evidence that Teimouri returned an Election Form indicating her desire to opt out of step 4 of the InSTORE program, i.e., arbitration.

B.    *Procedural background*

Teimouri filed a putative class action against Macy's on June 4, 2010. In her complaint, Teimouri asserted multiple violations of the Labor Code, including violations of overtime pay requirements, meal and rest break requirements, and wage deduction protections on behalf of herself and a class of similarly situated employees. Teimouri also requested civil penalties for the Labor Code violations under Labor Code section 2699 et seq., on behalf herself and other similarly aggrieved employees, pursuant to the PAGA, and asserted a claim for a violation of Business and Professions Code section 17200.

Teimouri filed a first amended complaint (FAC) on July 16, 2010, in which she asserted the same claims as were contained in her original complaint.

Macy's filed an answer to the FAC on August 27, 2010. Macy's 24th and final affirmative defense provided, "Upon information and belief, Plaintiff's First Amended

6

Complaint should be dismissed or stayed because Plaintiff Mehrnoosh Teimouri signed a written arbitration agreement requiring her to submit any employment-related dispute to final and binding arbitration." However, Macy's did not move to compel arbitration.

After Macy's answered, Macy's and Teimouri engaged in discovery. Macy's propounded 21 form interrogatories and 17 special interrogatories to Teimouri, and also sent her a deposition notice accompanied by 16 requests for production of documents. Teimouri provided responses to the form and special interrogatories.

Teimouri propounded 986 discovery requests, including at least 305 requests for production and 188 special interrogatories. In response to Teimouri's numerous discovery requests, on October 28, 2010, Macy's moved for a protective order.[1]

In addition to the discovery described above, the record on appeal discloses that the parties engaged in a few other minor litigation activities. For example, the parties stipulated to extend the May 26, 2011 class certification deadline and trial-related dates. After the trial court rejected the parties' stipulation, Teimouri moved ex parte for an order continuing the deadline for her to file her motion for class certification and to move "trial-related dates pursuant to the stipulation reached by the parties."

On June 10, 2011, just over nine months after filing its answer to Teimouri's FAC, Macy's moved to compel arbitration of Teimouri's individual claims and requested

---

[1] According to Macy's, the trial court did not rule on Macy's request for a protective order. The record on appeal does not disclose any ruling by the court on that request.

dismissal of Teimouri's representative[2] claims, pursuant to the terms of the arbitration agreement as outlined in step 4 of the InSTORE Program.[3]

On August 18, 2011, the trial court published its tentative ruling on Macy's motion to compel arbitration, in which the court ruled in favor of Teimouri and against Macy's. The court subsequently heard oral argument from the parties. On August 19, the court affirmed its tentative ruling. In essence, the trial court concluded that the class and/or collective action waiver was not enforceable as to Teimouri's non-PAGA class claims under the authority of *Gentry, supra,* 42 Cal.4th 443, and that the class and/or collective action waiver in the arbitration agreement was not enforceable as to Teimouri's PAGA claims under the authority of *Brown v. Ralphs Grocery Co.* (2011) 197 Cal.App.4th 489 (*Brown*).

Macy's filed a timely notice of appeal from the trial court's order denying its motion to compel arbitration.

_____

[2]　It appears that Macy's used the term "representative" in its motion to refer to both the PAGA and class claims in Teimouri's complaint, since it was requesting that the trial court compel individual arbitration of all of Teimouri's claims. Specifically, Macy's notice of motion states:

> "[Macy's] will and hereby does move the Court for an order dismissing Plaintiff Mehrnoosh Teimouri's ('Teimouri') representative claims in this matter, compelling arbitration of Teimouri's individual claims, and staying this action during the arbitration."

[3]　Macy's filed its motion to compel arbitration 44 days after the United States Supreme Court issued its decision in *ATT Mobility LLC. v. Concepcion* (2011) 563 U.S. ___ [131 S.Ct. 1740] (*Concepcion*). The parties dispute the effect of *Concepcion* on the arbitration provision at issue in this case.

## III.

## DISCUSSION

Macy's appeals from the trial court's order denying its motion to compel individual arbitration of Teimouri's claims. In the absence of material, conflicting extrinsic evidence, we apply our independent judgment to determine whether an arbitration agreement applies to a given controversy. (*Amalgamated Transit Union Local 1277 v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 673, 685.) If the trial court's decision regarding the arbitrability of claims depended on its resolution of disputed facts, we review those findings to determine whether there is substantial evidence to support them. (*Ibid.*)

The party opposing arbitration has the burden of showing that an arbitration provision is invalid or otherwise unenforceable. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972 ["The [party seeking to compel arbitration] bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition [to compel arbitration] bears the burden of proving by a preponderance of the evidence any fact necessary to its defense"].)

The central dispute between Macy's and Teimouri is whether the arbitration agreement—including its prohibition of class and representative claims—is enforceable under the law. We independently review the applicable law to determine whether the trial court's order denying Macy's motion to compel individual arbitration is correct.

9

A.    *Macy's motion to compel individual arbitration of Teimouri's claims should be granted because the arbitration agreement is enforceable, as written, pursuant to* Concepcion

　　　1.    *The FAA and California arbitration law*

　　　　　a.    *The FAA and federal arbitration law*

The parties do not dispute that the arbitration agreement at issue in this case is governed by the FAA.  Congress enacted the FAA "in response to widespread judicial hostility to arbitration agreements" (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1745]) and to "ensure that private arbitration agreements are enforced according to their terms."  (*Id*. at p. 1750, fn. 6.)  The FAA "incorporates a strong federal policy of enforcing arbitration agreements, including agreements to arbitrate statutory rights." (*Armendariz v. Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83, 96–97 (*Armendariz*).)

Section 2 of the FAA makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  (9 U.S.C. § 2.)  This provision reflects a " 'liberal federal policy favoring arbitration' [citation] . . . and the 'fundamental principle that arbitration is a matter of contract' [citation] . . . ."  (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1745].)  Pursuant to this policy, arbitration agreements are enforced according to their terms, in the same manner as other contracts.  (*Ibid*.)  Not all arbitration agreements—or specific provisions of those agreements—are necessarily enforceable, however.  Title 9 United States Code section 2's "saving clause" permits courts to invalidate agreements to arbitrate based on " 'generally applicable contract defenses, such as fraud, duress, or

10

unconscionability' [citation]." (*Concepcion*, *supra*, at p. 1746]), but it does not allow courts to invalidate agreements based on "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." (*Ibid*.; see also *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 235 (*Pinnacle*) ["the FAA precludes a court from construing an arbitration agreement 'in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot.' [Citation.]"].)

> b. *California law pertaining to class arbitrations and class action waivers prior to* Stolt-Nielsen *and* Concepcion

In *Keating v. Superior Court* (1982) 31 Cal.3d 584, 608-614 (*Keating*), the California Supreme Court held that a court may order classwide arbitration in an appropriate case. Unlike in this case, the arbitration agreement in *Keating* had no specific provision either permitting or precluding classwide arbitration. Despite the arbitration agreement's silence on the issue, the California Supreme Court held that a trial court has the discretionary authority to order classwide arbitration where doing so would serve the interests of justice. (*Id.* at pp. 613-614.) After *Keating*, class arbitration became a "well[-]accepted" method for resolving disputes in California. (*Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 152 (*Discover Bank*).)

11

Almost two decades later, the California Supreme Court considered various issues pertaining to the enforceability of a mandatory employment arbitration agreement in a wrongful termination case. (*Armendariz*, *supra*, 24 Cal.4th 83.) The *Armendariz* court held that although state statutes do not prohibit mandatory employment arbitration agreements, arbitration agreements that "encompass *unwaivable* statutory rights must be subject to particular [judicial] scrutiny." (*Id*. at p. 100.) The *Armendariz* court set forth five minimum requirements that an arbitration agreement must meet in order to ensure that mandatory arbitration agreements are not used as a means of curtailing an employee's unwaivable statutory rights: 1) the use of neutral arbitrators; 2) discovery; 3) a written award; 4) availability of relief that would otherwise be available in court; and 5) no additional costs for employees. (*Id*. at pp. 101-113.) The *Armendariz* court further held that even if an arbitration agreement meets these requirements, a court may refuse to enforce the agreement if the plaintiff demonstrates that the agreement is unconscionable. (*Id.* at pp. 113-114.)

In *Discover Bank*, *supra*, 36 Cal.4th at page 158, the California Supreme Court considered whether a class action waiver in a consumer adhesion contract was unenforceable as contrary to public policy, and/or unconscionable. In that case, a credit card holder filed a class action complaint alleging that Discover Bank had improperly imposed a late fee on payments received after 1:00 p.m. on the payment due date. (*Id*. at p. 154.) An arbitration agreement between the parties contained an express waiver of the right to proceed by class action in arbitration. Unlike the claims in *Armendariz*, the

12

plaintiffs' claims were not based on unwaivable statutory rights. (*Discover Bank*, *supra,* at pp. 153-154, 160.)

In considering whether the class arbitration waiver provision was enforceable, the *Discover Bank* court applied the portion of *Armendariz* that addressed application of the unconscionability doctrine to arbitration agreements. (*Discover Bank*, *supra*, 36 Cal.4th at pp. 160-163.) Specifically, the court noted that class action waivers in consumer adhesion contracts commonly involve both procedural and substantive aspects of unconscionability under state law. (*Id*. at pp. 161-162.)

The California Supreme Court fashioned what became known as the "*Discover Bank* rule*,*" holding that class action waivers are unconscionable if the "waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money . . . ." (*Discover Bank*, *supra*, 36 Cal.4th at pp. 162–163.) The court concluded that under these circumstances, a class action waiver is unconscionable and should not be enforced because it "becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.' [Citation.]" (*Id*. at p. 163.) The *Discover Bank* court observed that that class arbitration would be "workable and appropriate in some cases," and could be compelled when an otherwise valid arbitration agreement contained an unconscionable class waiver provision. (*Id*. at p. 172.)

13

In establishing this rule of unenforceability of class action waivers, the *Discover Bank* court rejected Discover Bank's argument that the FAA preempted the court's holding, concluding that the unconscionability rule that it was applying did not single out arbitration agreements. The court explained, " 'Under section 2 of the FAA, a state court may refuse to enforce an arbitration agreement based on "generally applicable contract defenses, such as fraud, duress, or unconscionability." ' [Citation.] In the present case, the principle that class action waivers are, under certain circumstances, unconscionable as unlawfully exculpatory is a principle of California law that does not specifically apply to arbitration agreements, but to contracts generally." (*Discover Bank*, *supra*, 36 Cal.4th at p. 165.)

Two years later, the California Supreme Court decided *Gentry*, *supra*, 42 Cal.4th 443. The plaintiff in *Gentry* had entered into an arbitration agreement with his employer that contained a class action waiver provision. (*Id*. at pp. 455-456.) Despite the existence of that agreement, the plaintiff brought a class action against his employer alleging violations of various Labor Code provisions that contained unwaivable statutory rights.

The *Gentry* opinion addressed two issues: (1) whether "class arbitration waivers in employment arbitration agreements may be enforced to preclude class arbitrations by employees whose statutory rights to overtime pay pursuant to Labor Code sections 500 et seq. and 1194 allegedly have been violated" (*Gentry*, *supra*, 42 Cal.4th at p. 450, fn. omitted), and (2) whether "a provision in an arbitration agreement that an employee can opt out of the agreement within 30 days means that the agreement is not procedurally

14

unconscionable, thereby insulating it from employee claims that the arbitration agreement is substantively unsconscionable or unlawfully exculpatory." (*Id.* at pp. 450-451.)[4]

With respect to the first issue, which is the significant one for purposes of this appeal, the *Gentry* court concluded that "in some cases, the prohibition of classwide relief would undermine the vindication of the employees' unwaivable statutory rights and would pose a serious obstacle to the enforcement of the state's overtime laws," and for these reasons, would be unenforceable. (*Gentry*, *supra*, 42 Cal.4th at p. 450.) The *Gentry* court established the following four-factor test for courts to employ in determining whether to decline to enforce a class action waiver in an arbitration agreement in favor of allowing class arbitration:

> "[W]hen it is alleged that an employer has systematically denied proper overtime pay to a class of employees and a class action is requested notwithstanding an arbitration agreement that contains a class arbitration waiver, the trial court must consider the factors discussed above: [(1)] the modest size of the potential individual recovery, [(2)] the potential for retaliation against members of the class, [(3)] the fact that absent members of the class may be ill informed about their rights, and [(4)] other real world obstacles to the vindication of class members' rights to overtime pay through individual arbitration. If [a court] concludes, based on these factors, that a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration, and finds that the disallowance of the class action will likely lead to a less comprehensive enforcement of overtime laws for the employees

---

4        The *Gentry* court explained that in its view, the first issue involved the validity of a *class arbitration waiver* "in terms of unwaivable statutory rights" (*Gentry*, *supra*, 42 Cal.4th at p. 467), while the second issue involved an analysis of the "unconscionability" of *the entire arbitration agreement*, with particular consideration given to the 30-day opt out provision and whether such a provision rendered the contract free from procedural unconscionability. (*Id*. at p. 470.)

alleged to be affected by the employer's violations, it must invalidate the class arbitration waiver to ensure that these employees can 'vindicate [their] unwaivable rights in an arbitration forum.' [Citation.]"  (*Id*. at p. 463.)

The *Gentry* court noted that it had granted review in the case "to clarify our holding in *Discover Bank*."  (*Gentry*, *supra*, 42 Cal.4th at p. 452.)  The court stated, "*Discover Bank* was an application of a more general principle: that although '[c]lass action and arbitration waivers are not, in the abstract, exculpatory clauses' (*Discover Bank*, *supra*, 36 Cal.4th at p. 161), such a waiver can be exculpatory in practical terms because it can make it very difficult for those injured by unlawful conduct to pursue a legal remedy."  (*Gentry*, *supra*, at p. 457.)  The *Gentry* court acknowledged that "class action waivers in wage and hour cases and overtime cases would have, at least frequently if not invariably, a similar exculpatory effect [as the provisions rendered unenforceable under the *Discover Bank* rule] for several reasons, and would therefore undermine the enforcement of the statutory right to overtime pay."  (*Ibid*.)  In reaching its ultimate conclusion that the class action waiver in the arbitration agreement was not enforceable, the court relied on *Armendariz*'s reasoning that " 'arbitration cannot be misused to accomplish a de facto waiver' " of unwaivable statutory rights.  (*Gentry*, *supra*, at p. 457.)[5]

---

[5]     The *Gentry* court reiterated the conclusion of the *Armendariz* court that "for public policy reasons we will not enforce provisions contained within arbitration agreements that pose significant obstacles to the vindication of employees' statutory rights."  (*Gentry*, *supra*, 42 Cal.4th at p. 463, fn. 7.)

With respect to the employer's argument that the rule that the *Gentry* court ultimately adopted would discriminate against arbitration clauses in violation of the FAA, the *Gentry* court responded: "We considered at great length and rejected a similar argument in *Discover Bank*. [Citation.] The principle that in the case of certain unwaivable statutory rights, class action waivers are forbidden when class actions would be the most effective practical means of vindicating those rights is an arbitration-neutral rule: it applies to class waivers in arbitration and nonarbitration provisions alike. [Citation.] 'The *Armendariz* requirements are . . . applications of general state law contract principles regarding the unwaivability of public rights to the unique context of arbitration, and accordingly are not preempted by the FAA.' [Citation.]" (*Gentry*, *supra*, 42 Cal.4th at p. 465.)

> c. *The United States Supreme Court's decisions in* Stolt-Neilsen *and* Concepcion

Three years after the *Gentry* decision, the United States Supreme Court decided *Stolt-Nielsen*, which addressed "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act (FAA), 9 [United States Code, section] 1 et seq." (*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. (2010)* 559 U.S. 662 [130 S.Ct. 1758, 1764] (*Stolt-Nielsen*).)

In *Stolt-Nielsen*, the parties had stipulated that the "arbitration clause was 'silent' with respect to class arbitration." (*Stolt-Nielsen*, *supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1766].) In determining the effect of this silence on the authority of a panel of arbitrators to impose class arbitration, the United States Supreme Court reiterated that "the central or

17

'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms.' [Citation.]" (*Id*. p. ___ [130 S.Ct. at p. 1773].) Thus, "[w]hether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties' [citation]" because, "[i]n this endeavor, 'as with any other contract, the parties' intentions control.' [Citation.]" (*Id*. at pp. ___-___ [130 S.Ct. at pp. 1773-1774].) Based on principles of contract interpretation and the purpose of the FAA to ensure that private arbitration agreements are enforced according to their terms, the *Stolt-Nielsen* court determined that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." (*Stolt-Nielsen*, *supra*, 559 U.S. ___;[130 S.Ct. at p. at p 1775].)

The *Stolt-Nielsen* court explained that "[a]n implicit agreement to authorize class-action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate" because the nature of class-action arbitration is so significantly different from the nature of individual arbitration that "it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." (*Stolt-Nielsen*, *supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1775].) Thus, before requiring a party to engage in class arbitration, the court must determine "whether the parties *agreed to authorize* class arbitration." (*Id*. at p. ___ [130 S.Ct. at p. 1776].) Where parties have "stipulated that there was 'no agreement' on this question," as the

18

parties had in *Stolt-Nielsen*, "the parties cannot be compelled to submit their dispute to class arbitration."  (*Ibid.*)[6]

In *Concepcion, supra*, 563 U.S. ___ [131 S.Ct. 1740], the United States Supreme Court examined the validity of the *Discover Bank* rule, after a federal district court relied on *Discover Bank* to conclude that an arbitration agreement was unconscionable because AT&T had not demonstrated that bilateral arbitration could adequately substitute for the deterrent effects of class actions in that case.  The precise issue before the court in *Concepcion* was whether the FAA prohibited a state rule, such as the one articulated by the California Supreme Court in *Discover Bank*, that conditioned "the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures." (*Concepcion, supra*, at p. ___ [131 S.Ct. at p. 1744].)

---

[6]  *Stolt-Nielsen* left open the question of what factors might allow a court or arbitrator to find that the parties agreed to class arbitration where the agreement is otherwise silent on the matter and there is not a stipulation that there was no agreement on the issue of class arbitration.  (*Stolt-Nielsen, supra*, 559 U.S. at p. ___, fn. 10 [130 S.Ct. at p. 1776, fn. 10] ["We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration"].)  After *Stolt-Nielsen*, some courts have recognized that an implied agreement may be sufficient to support ordering class arbitration.  (See *Jock v. Sterling Jewelers, Inc.* (2d Cir. 2011) 646 F.3d 113, 120–121; *Vazquez v. ServiceMaster Global Holding, Inc.* (N.D.Cal. June 29, 2011 No. C 09-05148 SI) 2011 U.S. Dist. Lexis 69753 at *9, fn. 1.)

Justice Ginsburg noted in her dissent in *Stolt-Nielsen* that the majority opinion "apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis" because the majority opinion "observ[ed] that 'the parties [here] are sophisticated business entities,' and 'that it is customary for the shipper to choose the charter party that is used for a particular shipment . . . .' " (*Stolt-Nielsen, supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1783] (dis. opn. of Ginsberg, J.).)  However, *Concepcion* indicates that a majority of the United States Supreme Court is of the view that even unsophisticated parties subjected to adhesion contracts may be considered to have agreed *not to engage* in class arbitration where an adhesion contract contains an express class action waiver.

19

The *Concepcion* court identified two types of state rules that are preempted by the FAA. The first type is relatively simple to recognize. "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1747].) The second type of rule requires a more nuanced inquiry into its validity. This type of rule exists when a general defense that would otherwise be permitted by the FAA's section 2 saving clause (i.e., a defense such as unconscionability) is "applied in a fashion that disfavors arbitration." (*Concepcion*, *supra*, at p ___ [131 S.Ct. at p. 1747].) Where this occurs, application of the defense might violate the rule "that a court may not 'rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot.' " (*Ibid.*, quoting *Perry v. Thomas* (1987) 482 U.S. 483, 493, fn. 9.)

With respect to the second type of rule, the *Concepcion* court held: "Although [section] 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules *that stand as an obstacle to the accomplishment of the FAA's objectives*." (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1748], italics added.) The "overarching purpose of the FAA," the *Concepcion* court explained, "is to ensure the enforcement of arbitration agreements *according to their terms so as to facilitate streamlined proceedings*." (*Ibid.*, italics added.) Because "[r]equiring the availability of classwide arbitration interferes with fundamental attributes

20

of arbitration," a rule such as the one established in *Discover Bank* "creates a scheme inconsistent with the FAA." (*Concepcion*, *supra*, at p. ___ [131 S.Ct. at p 1748].)

The *Concepcion* court rejected the notion that because the *Discover Bank* rule did not *require* classwide arbitration, it did not interfere with arbitration. Rather, the court determined that "class procedures" are incompatible with the benefits of arbitration, and, thus, interfere with arbitration. (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at pp. 1752-1753].) The *Concepcion* court explained that among the reasons that a rule imposing class arbitration in the absence of consent by the parties is inconsistent with the FAA are (1) the "switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—it's informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment"; (2) class arbitration "requires procedural formality" (*id*. at p. ___ [131 S.Ct. at p. 1751], italics omitted) to protect third-parties' due process rights; and (3) class arbitration "greatly increases risks to defendants," in part because arbitration is "poorly suited to the higher stakes of class litigation." (*Id*. at p. ___ [131 S.Ct. at p. 1752].)

> 2. *The continuing application of* Gentry *to invalidate class action waivers in arbitration agreements is undermined by the holdings in* Stolt-Nielsen *and* Concepcion; *the arbitration agreement, including the class waiver, must be enforced as written*

Teimouri and Macy's strenuously disagree as to the continuing viability of *Gentry* in light of the decision in *Concepcion*. They are not alone. There continues to be a difference of opinion among courts, both federal and state, as to whether the United

21

States Supreme Court's holding in *Concepcion* that the FAA preempts the *Discover Bank*

rule implicitly overruled *Gentry*.[7]

In considering this question ourselves, we can find no principled basis to

distinguish the rule established in *Discover Bank* and the rule established in *Gentry* with

respect to the availability of classwide arbitration in the face of an express agreement

precluding class arbitration. Neither *Gentry* nor *Discover Bank* created a categorical rule

imposing class arbitration in the face of a class action waiver. Rather, the rules set forth

---

[7]     A number of courts have concluded that *Concepcion* implicitly overrules *Gentry*.
(See *Jasso v. Money Mart Express, Inc.* (N.D. Cal. 2012) 879 F.Supp.2d 1038
[concluding *Concepcion* effectively overrules *Gentry* rule]; *Morvant v. P.F. Chang's
China Bistro, Inc.* (N.D. Cal. 2012) 870 F. Supp. 2d 831, 840-841 [same]; *Sanders v.
Swift Transp. Co. of Ariz., LLC* (N.D. Cal. 2012) 843 F.Supp.2d 1033, 1037 [same];
*Lewis v. UBS Financial Services, Inc.* (N.D. Cal. 2011) 818 F.Supp.2d 1161, 1167
[same]; *Valle v. Lowe's HIW, Inc.* (N.D. Cal. Aug. 22, 2011, No. 11-1189 SC) 2011 U.S.
Dist. LEXIS 93639 at *15-17 [same]; *Quevedo v. Macy's Inc.* (C.D. Cal. 2011) 798
F.Supp.2d 1122, 1142 (*Quevedo*) [*Gentry*'s reasoning is "longer tenable in light of"
*Concepcion*]; *Murphy v. DirecTv, Inc.* (C.D. Cal. Aug. 2, 2011, No. 2:07-cv-064565-
JHN-VBKx) 2011 U.S. Dist. LEXIS 87625 at *11 [*Concepcion* overrules *Gentry*]);
*Morse v. ServiceMaster Global Holdings, Inc.* (N.D. Cal. July 27, 2011, No. C 10-00628-
SI) 2011 U.S. Dist. LEXIS 82029 at *9, fn. 1 [*Concepcion* rejected reasoning and
precedent behind *Gentry*, even if not explicitly overruling it].)
        Other courts have either assumed or concluded that *Gentry* remains binding
precedent despite *Concepcion*. (See *Kinecta Alternative Financial Solutions, Inc. v.
Superior Court* (2012) 205 Cal.App.4th 506, 516 [assuming, without deciding, that
*Gentry* was not overruled by *Concepcion*]; *Brown*, *supra*, 197 Cal.App.4th at p. 498
[although not deciding the issue, suggesting that *Gentry* remains binding law]; *Truly
Nolen of America v. Superior Court* (2012) 208 Cal.App.4th 487, 493 (*Truly Nolen*)
[despite language in *Concepcion* "strongly suggest[ing]" that *Gentry*'s holding is
preempted by federal law, because *Concepcion* did not directly rule on *Gentry*, appellate
courts remain bound to apply it].)
        On September 19, 2012, the California Supreme Court granted a petition for
review in *Iskanian v. CLS Transportation Los Angeles, LLC* (2012) 206 Cal.App.4th 949,
959 (rev. granted Sept. 19, 2012, No. S204032) (*Iskanian*), in which the appellate court
concluded that *Concepcion* "conclusively invalidates the *Gentry* test."

in both of those cases require courts to look to the modest size of individuals' potential recovery, the inequality in the parties' knowledge and bargaining power in the contractual relationship, and "other real world obstacles" to vindication of the individuals' rights. (Compare *Discover Bank*, *supra*, 36 Cal.4th at p. 162, with *Gentry*, *supra*, 42 Cal.4th at p. 463.) In abrogating the *Discover Bank* rule, the *Concepcion* court made it clear that it rejected the California Supreme Court's reasoning that in some circumstances, state policy reasons justify the use of class arbitration proceedings despite the parties' express agreement that class proceedings would not be available. (*Concepcion*, *supra*, 563 U.S. at pp. ___, ___ [131 S.Ct. at pp. 1748, 1753] [even if a particular procedure is desirable to the state for a reason unrelated to the FAA, if the procedure is inconsistent with the FAA, the state may not require it; class arbitration is a procedure that is inconsistent with the FAA].)

The fact that *Gentry* addresses arbitration agreements in employment contracts and provides a rule allowing courts to find class waivers unenforceable based on the rationale that plaintiffs might not be able to effectively vindicate nonwaivable statutory rights if a class proceeding were not available, while *Discover Bank* pertained to consumer contracts and provided a rule allowing class action waivers to be found unenforceable on unconscionability grounds, is not, in our view, a significant distinction for purposes of applying *Concepcion*. Under *Gentry*, if a plaintiff is successful in meeting the four-part test, the case is to be decided in class arbitration (unless the plaintiff could show that the entire arbitration agreement was unconscionable, in which case the entire arbitration agreement would be voided). *Concepcion* unequivocally rejected the notion that class

23

arbitration procedures may be imposed on a party who never agreed to them, and clearly stated that nonconsensual class arbitration is inconsistent with the FAA. (*Concepcion*, *supra*, 563 U.S. at pp. ___–___ [131 S.Ct. at pp. 1751–1752].) This broad rejection of a court-imposed rule promoting class arbitration where the parties have agreed to waive class proceedings applies with equal force to the *Gentry* rule as it did to the *Discover Bank* rule.

To the extent that *Gentry* rests on the principle that a class waiver should not be enforced where the amounts at issue and the expense of prosecuting the claims would effectively preclude *vindication of statutory rights*, *Concepcion* essentially rejects the argument that a state's public policy reasons for promoting class arbitration can provide a basis for requiring class arbitration in the face of an express waiver of class arbitration by the parties. The majority in *Concepcion* rejected the contention that a state's interest in providing for class proceedings because they are "are necessary to prosecute small-dollar claims that might otherwise slip through the legal system" is sufficient to justify the existence of a state rule that thwarts the goals of the FAA. (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1753].) After *Concepcion*, it is clear that a state's policy concerns—even when codified as statutory rights—do not permit a state to "require a procedure that is inconsistent with the FAA." (*Ibid.*)

The interpretation of FAA preemption announced in *Concepcion directly and conclusively* undercuts *Gentry*'s rationale, and we are bound by the United States Supreme Court's rulings with respect to federal questions, such as preemption. (*Elliot v. Albright* (1989) 209 Cal.App.3d 1028, 1034 [" 'Decisions of the United States Supreme

24

Court are binding not only on all of the lower federal courts [citation], but also on state courts when a federal question is involved' [citation]," and thus a state court considering a case involving a federal question, such as preemption, is bound by federal law].)  Macy's motion to compel individual arbitration raises the question whether the FAA preempts application of California's *Gentry* rule.  We therefore must apply United States Supreme Court precedent that speaks to federal preemption of a state rule that may impose class arbitration despite the existence of an express waiver of class arbitration in an arbitration agreement governed by the FAA.  Although *Concepcion* analyzed the viability of one particular state rule—i.e., the *Discover Bank* rule—on a broader level, it interprets the scope of the savings clause in section 2 of the FAA.  "As we have said, a federal statute's saving clause ' "cannot in reason be construed as [allowing] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act.  In other words, the act cannot be held to destroy itself." ' [Citations.]"  (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1748].)  When a state rule exists to "require[e] the availability of classwide arbitration," it "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA."  (*Ibid.*)

We acknowledge that in *Truly Nolen, supra,* 208 Cal.App.4th 487, a panel of this court elected to follow *Gentry* "until the California Supreme Court has the opportunity to review the decision in light of the recent United States Supreme Court decisions in *Concepcion* and *Stolt-Nielsen*," despite recognizing that *Concepcion* is inconsistent with *Gentry* and questioning *Gentry*'s continuing vitality.  (See *Truly Nolen*, *supra*, at p. 507.)

25

The *Truly Nolen* court identified the problem with attempting to apply *Gentry* after

*Concepcion* as follows:

> "Although *Gentry* and *Discover Bank* were founded on different
> theoretical grounds because *Discover Bank* was based on an
> unconscionability analysis and *Gentry* was based on the *Armendariz*
> public policy rationale (see *Arguelles-Romero v. Superior Court*
> (2010) 184 Cal.App.4th 825, 836–841), *Concepcion*'s holding was
> unrelated to the fact that *Discover Bank* was a particular application
> of California's unconscionability analysis. *Concepcion* reaffirmed
> the validity of a state's general unconscionability defenses as applied
> to arbitration agreements, but found *Discover Bank* objectionable
> mainly because it allowed courts to ignore and refuse to enforce the
> clear terms of the parties' agreement, and instead employ a judicial
> policy judgment that the class procedure would better promote the
> vindication of the parties' rights in certain cases. This discredited
> reasoning is the same rationale employed by the *Gentry* court. In
> requiring courts to consider the four enumerated factors, the *Gentry*
> court held that courts have the authority to invalidate class action
> waivers in wage and hour cases because the waivers would
> 'frequently if not invariably' have an 'exculpatory effect' that is
> 'similar' to the consumer waivers considered in *Discover Bank* and
> thus would potentially 'undermine the enforcement' of the
> employee's statutory rights. [Citation.]
>
> "Based on *Concepcion*'s expansive language and its clear mandate
> that arbitration agreements must be enforced according to their terms
> despite a state's policy reasons to the contrary, and the United States
> Supreme Court's recent holding that this principle extends to federal
> statutory claims ([*CompuCredit Corp. v. Greenwood* (2012)] 565
> U.S. ___ [132 S.Ct. 665]), we agree with those courts that have
> questioned the continuing validity of the *Gentry* standard to
> invalidate an express arbitration waiver contained in an employment
> arbitration agreement governed by the FAA. This same conclusion
> applies to employment arbitration agreements that do not contain an
> express or implied agreement to permit class arbitration. Under the
> reasoning of *Concepcion* and *Stolt-Nielsen*, absent a showing of
> mutual consent, it is questionable whether courts can validly invoke
> *Gentry* to require an objecting party to engage in classwide
> arbitration." (*Truly Nolen*, *supra*, 208 Cal.App.4th at p. 506.)

26

The *Truly Nolen* court appears to have decided to "adhere to *Gentry*" because *Concepcion* "did not directly address the precise issue presented in *Gentry*." (*Truly Nolen*, *supra*, 208 Cal.App.4th at p. 507.)

However, in *Truly Nolen*, the court did not have to definitively resolve the question that we must address in this case, i.e., whether *Gentry* survives *Concepcion*, because the *Truly Nolen* court concluded that the plaintiff in that case had not presented sufficient evidence of the *Gentry* factors to establish that class arbitration was required. Essentially, the *Truly Nolen* court could presume that *Gentry* was still good law because it was reversing the order of the trial court in any event. Given the fact that *Truly Nolen* did not have to decide whether *Gentry* survives *Concepcion*, and given *Truly Nolen*'s clear indication that it viewed *Gentry*'s continuing viability as questionable at best, we do not view our conclusion here as wholly inconsistent with the holding in *Truly Nolen*. Rather, after further consideration of the issue, and having the benefit of recent decisions addressing the questions at hand, we conclude that we should give effect to the portion of *Truly Nolen* that acknowledges the problems with *Gentry*'s viability after *Concepcion*, and expressly hold that *Concepcion* implicitly overrules *Gentry*.

We conclude that the United States Supreme Court's decision in *Concepcion* entirely undermines the portion of *Gentry* holding that class action waivers in arbitration agreements may not be enforced when they implicate unwaivable statutory rights.[8] We

---

8    *Gentry* remains binding law only with respect to the portion of that opinion in which the *Gentry* court considered the application of the general defense of unconscionability to the arbitration agreement.

can see no principled way to construe *Concepcion* in a manner that would allow for the class arbitration rule of *Gentry* to survive. Rather, to continue to give effect to *Gentry* despite the broad language in *Concepcion* would require us to engage in tortured reasoning to circumvent the clear mandate of *Concepcion.* Simply put, even if we were to attempt to apply the law set forth in *Gentry*, and even if a court found that all of the *Gentry* factors were present in a given case, the plaintiff's claims would either have to be arbitrated on a classwide basis—an option that *Concepcion* and *Stolt-Nielsen* clearly reject when the parties have not agreed to classwide arbitration, or the class claims alleged in the complaint would have to remain under the jurisdiction of the court and be litigated in that forum rather than arbitrated, effectively rendering the entire arbitration agreement unenforceable as to certain claims—a result that interferes with the arbitration of claims under the FAA. (See *Pinnacle*, *supra*, 55 Cal.4th at p. 235 ["To ensure that arbitration agreements are enforced according to their terms, 'the FAA pre-empts state laws which "require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration" ' [citation]"].)

Rather than continue to apply *Gentry*, we conclude that *Concepcion* controls and requires that we apply the federal preemption principles enunciated in that decision. We further conclude that pursuant to the rationale of *Concepcion*, we may not deem a class arbitration provision in an arbitration agreement unenforceable based on a finding that a class is a "significantly more effective practical means of vindicating the rights of the affected employees" (*Gentry*, *supra*, 42 Cal.4th at p. 463). The fact that *Concepcion* did not specifically address the rule announced in *Gentry* does not permit us to disregard

28

*Concepcion*'s broad conclusion that the FAA prohibits *state-law created barriers to arbitration* on the grounds articulated by the *Gentry* court. Ordering class arbitration pursuant to such a rule, or ordering that class claims be litigated in court (which is what the trial court here appears to have done), would plainly "stand as an obstacle to the accomplishment of the FAA's objectives" (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1748]) where the parties have a valid arbitration agreement that includes a class and collective action waiver.[9]

Accordingly, we hold that the class action waiver is enforceable under *Concepcion*, and that Macy's motion to compel individual arbitration of Teimouri's claims must be granted.

3. *Teimouri's individual PAGA claims may be arbitrated*

The trial court concluded that Teimouri does not have to arbitrate her PAGA claims against Macy's because the collective action waiver in the arbitration agreement, which by its terms covers representative actions, cannot be enforced as to PAGA claims.

---

[9] The trial court denied the motion to compel arbitration of all of Teimouri's non-PAGA claims based on its conclusion that the "class action waiver" in the arbitration agreement is unenforceable. However, under *Gentry*, if the court determined that the class action waiver was unenforceable, the court should have granted the motion to compel arbitration on a classwide basis. (*Gentry*, *supra*, 42 Cal.4th at p. 466 [if trial court "invalidates the [class action] waiver on policy grounds, then the parties may proceed to class arbitration" unless the parties both waive arbitration and proceed to litigate the claims].) *Gentry* does not provide the trial court with the option of retaining the action in a judicial forum unless the court determines that the entire agreement is unenforceable. Given that the trial court in this case did not make a finding that the *entire* arbitration agreement was invalid on other grounds, such as unconscionability, the trial court's order did not properly apply *Gentry*, in that it failed to send the matter to an arbitral forum for class arbitration.

We conclude that the collective action waiver is enforceable, and that it precludes Teimouri from arbitrating (or litigating) her representative PAGA claims, but permits her to arbitrate her own individual PAGA claims.

Pursuant to PAGA, "an aggrieved employee" may bring a civil action "on behalf of himself or herself and other current or former employees" to recover civil penalties for Labor Code violations. (Lab. Code, § 2699, subd. (a).)[10] An "aggrieved employee" means "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (*Id*., subd. (c).) The statute provides for civil penalties of $100 "for each aggrieved employee per pay period for the initial violation" and $200 "for each aggrieved employee per pay period for each subsequent violation." (*Id*., subd. (f).) When an employee sues under PAGA, he or she acts "as the proxy or agent of the state's labor law enforcement agencies" to "supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986 (*Arias*).) "The purpose of the PAGA is not to recover damages or restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor Code.

---

[10] Subdivision (a) of Labor Code section 2699 provides in full:

> "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3."

[Citation.] . . . [T]he relief is in large part 'for the benefit of the general public rather than the party bringing the action [citation] . . . .' " (*Brown*, *supra*, 197 Cal.App.4th at p. 501.) With one exception, penalties recovered by aggrieved employees are to be distributed 75 percent to the Labor and Workforce Development Agency and 25 percent to the aggrieved employees. (Lab. Code, § 2699, subd. (i).)

Several courts have recently construed PAGA as creating solely a "representative claim," and not an individual claim that a plaintiff may bring on his or her own. (See *Machado v. M.A.T. & Sons Landscape, Inc*. (E.D.Cal. July 23, 2009, No. 2.09-cv-00459-JAM-JFM) 2009 U.S. Dist. Lexis 63414 at *6 (*Machado*); see also *Reyes v. Macy's, Inc.* (2012) 202 Cal.App.4th 1119, 1123 [relying on *Machado* to state that "[a] plaintiff asserting a PAGA claim may not bring the claim simply on his or her own behalf but must bring it as a representative action and include ' "other current or former employees" ' [citation]"]; *Casida v. Sears Holdings Corp*. (E.D. Cal. Aug. 29, 2012, No. 1:11-cv-01052-AWI-JLT) U.S. Dist. LEXIS 9302 at *9 [relying on *Machado* to conclude that a PAGA claim must be brought as a representative suit]; *Urbino v. Orkin Services of California* (C.D.Cal. 2011) 882 F.Supp.2d 1152, 1167 [relying on *Brown*, *Arias*, and *Machado* to conclude that a PAGA claim is fundamentally a representative enforcement action, meant to be brought on behalf of the plaintiff *and* other aggrieved employees]; *Thomas v. Aetna Health of Cal*., *Inc*. (E.D. Cal., June 2, 2011, No. 1:10-cv-01906-AWI-SKO) 2011 U.S. Dist. LEXIS 59377 at *29-*31 (*Thomas*) [relying on *Machado* for holding that PAGA claim must be a representative claim].) It appears that the federal district court in *Machado* was the first court to address the issue directly, and that other

31

courts have followed *Machado*'s lead without independent analysis of *Machado*'s interpretation of the statute.[11] We believe that these courts have misconstrued the statutory language in a manner that limits the intended scope of PAGA in a way that the legislature did not intend, and, as a result, have unnecessarily eliminated the possibility of one form of a PAGA claim.

Some basic principles of statutory analysis are well established. " '[W]e must look first to the words of the statute, "because they generally provide the most reliable indicator of legislative intent." [Citation.] If the statutory language is clear and unambiguous our inquiry ends. "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citations.] In reading statutes, we are mindful that words are to be given their plain and commonsense meaning. [Citation.]' [Citation.] Thus, we 'avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend. [Citations.]' [Citation.]" (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394.) We should also be mindful that in giving the words of a statute "their ordinary and usual meaning" we should also "construe them in the context of the statute as a whole." (*American Liberty Bail Bonds, Inc. v. Garamendi* (2006) 141 Cal.App.4th 1044, 1052.) Moreover, a statute is not to be read in isolation but rather must be construed with

---

11    In contrast to these cases, the court in *Quevedo*, *supra*, 798 F.Supp.2d at page 1141, concluded—without analyzing the statutory language—that a plaintiff may pursue an individual PAGA claim. The court in *Brown*, *supra*, 197 Cal.App.4th at page 503, footnote 8, criticized *Quevedo* for failing to note the existence of *Machado* and address its conclusion that a PAGA claim can be brought only as a representative action.

related statutes and considered in the context of the statutory framework as a whole. (*Estate of Burden* (2007) 146 Cal.App.4th 1021, 1028.)

The relevant language of Labor Code section 2699, subdivision (a) states: "[A]ny provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or [other enforcement entities or individuals] for a violation of this code, may, as an alternative, be recovered through a civil action *brought by an aggrieved employee on behalf of himself or herself and other current or former employees*." (Italics added.) The question is whether the "and" between "himself or herself" and "other current or former employees" *requires* that a plaintiff, in every instance, bring a representative claim on behalf of other current or former employees, such that a plaintiff may not bring a PAGA claim for civil penalties for violations that he or she, alone, suffered.

As the *Machado* court noted, the "word 'and' commonly connotes conjunction and is used 'as a function word to indicate connection or addition.' " (*Machado*, *supra*, 2009 U.S. Dist. Lexis 63414 at *6, quoting Merriam-Webster's Collegiate Dictionary (10th ed. 2002) p. 43.) Based on the dictionary definition of "and," the *Machado* court concluded that in order to give effect "to the 'common acceptation' of the word 'and,' " the statute should be interpreted as requiring that a PAGA claim be brought on behalf of other employees, without consideration of "customary rules of statutory construction or legislative history." (*Machado*, *supra*, at *6-*7.)

We agree that the word "and," which in this statute separates the terms "himself or herself" from "other current or former employees," is a conjunctive term if viewed

33

literally. However, California courts have long acknowledged that in construing a statute, the word "and" may be interpreted as "or" in order to carry out the legislative intent. (See *Newland v. Board of Governors* (1977) 19 Cal.3d 705, 716; *Bianco v. Industrial Acc. Commission* (1944) 24 Cal.2d 584, 587.) Under the interpretation adopted by *Machado*, an employee who has suffered a violation of the Labor Code that no other employee has also suffered would be unable to join a PAGA claim to his or her other claims for relief. As with most questions of statutory construction, whether the Legislature actually and consciously intended to exclude an employee with individual claims of Labor Code violations from PAGA's coverage is not a question that can be precisely confirmed or refuted. Nevertheless, an examination of the stated purpose of the statute indicates that the Legislature did not intend to limit PAGA actions only to those that are brought on behalf of both the plaintiff *and* other employees.

The evident purpose of the statute is to expand the protection of all employees under the Labor Code, and to ensure sufficient enforcement of the Labor Code protections despite the inadequate staffing at state labor law enforcement agencies. (Stats. 2003, ch. 906, § 1; see also *Arias*, *supra*, 46 Cal.4th at p. 986 ["The act's declared purpose is to supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves"]; *Thomas v. Aetna Health of Cal., Inc.*, *supra*, 2011 U.S. Dist. Lexis 59377 at *27 ["Two catalysts identified for enacting PAGA involved a need for adequate financing of labor law enforcement to achieve maximum compliance with state labor laws and to ensure a disincentive for employers to engage in unlawful employment practices"].) Allowing an employer to avoid a penalty that would

34

otherwise be assessed for a violation of the Labor Code because that employer acted unlawfully only as to a single employee would be contrary to the purpose of the statute.

The more reasonable interpretation of the statute, in our view, is that the "and" should be read to also include "or," such that PAGA does not *require* that a plaintiff find other employees who have suffered his same fate before being able bring a PAGA claim for civil penalties for each Labor Code violation. It is difficult to conceive of a reason why, in crafting PAGA, the legislature would create a broad representative cause of action with the intention of protecting the rights of *all* employees, but at the same time exclude from the scope of the statute a more narrow cause of action brought by an individual employee on his own behalf. For this reason, we disagree with those cases that have concluded that PAGA claims may be brought *only* as representative claims. Rather, we conclude that a plaintiff may assert a PAGA claim on an individual basis.[12]

Because we conclude that a plaintiff may bring an individual PAGA claim, we are unconvinced by Teimouri's argument that enforcing the collective action waiver would effectively "extinguish[]" her PAGA claim.

We reject the reasoning of the court in *Brown*, *supra*, 197 Cal.App.4th 489, the decision on which the trial court relied in denying Macy's motion to compel Teimouri to arbitrate her PAGA claims on an individual, as opposed to representative, basis. In

---

12    See also *Quevedo, supra*, 798 F.Supp.2d at pages 1140-1142 [concluding without analyzing the statutory language that a plaintiff may bring an individual PAGA claim and may be required to arbitrate that claim individually where there is an arbitration agreement with a representative action waiver], and *Brown, supra,* 197 Cal.App.4th at page 509 (conc. and dis. opn. of Kreigler, J.) [suggesting that allowing individual arbitration of a PAGA claim is not inconsistent with PAGA statute].

*Brown*, the court observed that in *Concepcion*, the United States Supreme Court had not addressed the validity of a waiver of PAGA claims, and concluded that the rationale of *Concepcion* was inapplicable in a case involving PAGA claims because a plaintiff who brings a PAGA claim is bringing that claim " 'as the proxy or agent of the state's labor law enforcement agencies.' [Citation.]" (*Brown*, *supra*, at p. 503, 502.)[13] Ruling on an arbitration agreement similar to the one at issue here, which governed all employment-related disputes and expressly precluded arbitration of disputes " 'as a private attorney general, or on bases involving claims or disputes brought in a representative capacity on behalf of the general public . . . ' [citation]" (*id.* at p. 495), the *Brown* court held that *Concepcion* did not govern waivers of the PAGA right to bring a representative action, and that the FAA did not preempt California state law that rendered such waivers unenforceable. (*Id.* at pp. 498-503.) Concluding that the PAGA waiver provision in the

---

[13] A dissenting judge in *Brown* was of the view that under *Concepcion*, the PAGA waiver in the arbitration agreement at issue was enforceable and that the plaintiff was therefore precluded from pursuing a representative PAGA action, stating:

> "Given the consistent line of Supreme Court cases mandating
> enforcement of arbitration clauses under the FAA, even in the face
> of California statutory or decisional law requiring court or
> administrative action rather than arbitration, I cannot join the
> majority's conclusion that the arbitration agreement's waiver of
> representative PAGA actions is unenforceable. 'The point of
> affording parties discretion in designing arbitration processes is to
> allow for efficient, streamlined procedures tailored to the type of
> dispute.' ([*Concepcion*], *supra*, 563 U.S. at p. ___ [131 S.Ct. at p.
> 1749].) Brown and Ralphs/Kroger agreed to the streamlined
> procedures of arbitration of all covered employment claims without
> resort to classwide or representative litigation. That agreement must
> be enforced under the FAA." (*Brown*, *supra*, 197 Cal.App.4th at p.
> 508 (conc. and dis. opn. of Kriegler, J.).)

arbitration agreement was unenforceable, the *Brown* court reasoned, "[*Concepcion*] does not purport to deal with the FAA's possible preemption of contractual efforts to eliminate representative private attorney general actions to enforce the Labor Code." (*Brown*, *supra*, at p. 500.) "If the FAA preempted state law as to the unenforceability of the PAGA representative action waivers, the benefits of private attorney general actions to enforce state labor laws would, in large part, be nullified." (*Id.* at p. 502.)

Teimouri argues that *Brown* "is binding California case law directly on point and is not contradicted by any other California state authority," and that because neither the California Supreme Court nor the United States Supreme Court granted review in *Brown*, we should accept it as unqualified authority and follow its analysis. First, we reject the contention that *Brown* constitutes binding precedent that we are obligated to follow. (See, e.g., *Henry v. Associated Indemnity Corp.* (1990) 217 Cal.App.3d 1405, 1416 [decisions of one appellate court have no stare decisis effect, and are not binding upon other appellate courts]; see also *Agoston v. Pennsylvania* (1950) 340 U.S. 844 [the denial of a petition for writ of certiorari provides no expression of opinion on the merits of a case].) Second, we disagree with the *Brown* court's analysis of the PAGA issue, and therefore, decline to follow it. Rather, we find the reasoning of the court in *Quevedo, supra*, 798 F.Supp.2d at pages 1140-1142, as to why a collective/representative action waiver must be enforced after *Concepcion*—even with respect to a PAGA claim—to be more persuasive, and apply its reasoning, instead.

As the *Quevedo* court determined, even where there is a collective action waiver, a plaintiff's PAGA claim "is plainly arbitrable to the extent that he asserts it only on his

37

own behalf." (*Quevedo*, *supra*, 798 F.Supp.2d at p. 1141.)[14] In Teimouri's PAGA claims, she seeks civil penalties for a variety of violations of the Labor Code that she alleges Macy's engaged in, including, inter alia, unpaid overtime, unpaid rest period premiums, unlawful wage deductions, and wages not timely paid upon termination. These alleged violations undoubtedly qualify as claims that come within the scope of the arbitration agreement, and there is nothing in the arbitration agreement that would preclude Teimouri from pursuing these claims in arbitration as individual claims for civil penalties.

What prevents Teimouri from arbitrating her PAGA claims on behalf of other employees is the collective action waiver, which provides that an arbitrator shall not have "the power to hear an arbitration as a class or collective action." The agreement defines a "collective action" as one that "involves representative members of a large group, who claim to share a common interest, seeking relief on behalf of the group."

We recognize that PAGA serves to benefit the public, and that private attorney general laws may be severely undercut by application of the FAA when arbitration agreements include representative action waivers—a concern that the *Brown* court raised. However, we believe that the United States Supreme Court's analysis in *Concepcion* renders *Brown*'s reasoning untenable. In *Concepcion*, the court held that under the FAA, states cannot "condition[] the enforceability of . . . arbitration agreements on the

---

14     We acknowledge that the court in *Quevedo*, *supra*, 798 F.Supp.2d at page 1141 *presumed* that a plaintiff may bring an individual PAGA claim, without considering whether such a claim is permissible under the statutory language. As we have already explained, we believe that the *Quevedo* court's presumption is correct.

availability of classwide arbitration procedures" (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1744]), and concluded that the FAA preempted "state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives" of "promot[ing] arbitration" and " 'ensur[ing] that private arbitration agreements *are enforced according to their terms*.' [Citation.]" (*Id*. at pp. 1748, 1749, italics added.)

The *Concepcion* court concluded that requiring class arbitration when an arbitration agreement precludes it is "inconsistent with the FAA" because class arbitration "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment" (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at pp. 1751) and because "class arbitration greatly increases risks to defendants" (*id*. at p. ___ [131 S.Ct. at p. 1752]), as "[t]he absence of multilayered review makes it more likely that errors will go uncorrected." (*Ibid*.) The *Concepcion* court further explained that "[s]tates cannot require a procedure that is inconsistent with the FAA, *even if it is desirable for unrelated reasons*." (*Id*. at p ___ [131 S.Ct. at p. 1753], italics added.) Because class arbitration is inconsistent with the FAA, states cannot compel it, despite the existence of compelling policy reasons for deciding certain claims on a classwide basis. (See *ibid*.)

The *Concepcion* court's reasons hold true as to an arbitration agreement that, by its terms, prohibits the arbitration of representative actions. A state law rule that requires that courts not enforce arbitration agreements as written in order to allow plaintiffs to arbitrate representative PAGA claims on behalf of other employees would be inconsistent with the FAA. Similarly, a state law rule rendering representative action waivers in

39

arbitration agreements unenforceable in order to allow plaintiffs to bring representative PAGA claims in a judicial forum, thereby entirely avoiding the effects of the parties' contract to arbitrate certain claims between them, would be inconsistent with the FAA. Neither of these results is reasonable under the clear direction that the United States Supreme Court provided in *Concepcion*.

We do not find compelling the *Brown* court's suggestion that the arbitration of a representative PAGA claim brought in an action in which there is an arbitration agreement that contains a collective action waiver "would not have the attributes of a class action that the [*Concepcion*] case said conflicted with arbitration, such as class certification, notices, and opt outs." (*Brown*, *supra*, 197 Cal.App.4th at p. 503.) Rather, the arbitration of representative PAGA claims would retain many of the same characteristics of class arbitration that the United States Supreme Court determined in *Concepcion* are inconsistent with the FAA. Specifically, like a class claim, a claim brought on a representative basis would make for a slower, more costly process. Although a representative PAGA claim would not require all of the class certification procedures, at a minimum, there would have to be discovery into how many employees may have suffered violations and how many times such violations occurred. All of this could prove costly and time-consuming. In addition, representative PAGA claims "increase[] risks to defendants" by essentially aggregating the claims of many employees. (See *Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1752].) Defendants would run the risk that an erroneous decision on a PAGA claim on behalf of many employees would "go uncorrected" given the "absence of multilayered review." (*Ibid.*) For the

40

same reasons that "[a]rbitration is poorly suited to the higher stakes of class litigation" (*ibid*.), it is reasonable to conclude that arbitration is similarly ill-suited to the higher stakes of a collective PAGA action. We therefore conclude that a rule permitting courts to order representative PAGA claims to be arbitrated despite a collective action or representative action waiver in an arbitration agreement would run afoul of the FAA and the principles enunciated in *Concepcion*.

We acknowledge that not permitting Teimouri to litigate her representative PAGA claims in a judicial forum and instead requiring that she arbitrate her individual PAGA claims in an arbitral forum may have a negative effect on the public enforcement of labor laws under PAGA. As the *Brown* court explained, the purpose of PAGA "is not to recover damages or restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor Code. [Citation.]" (*Brown*, *supra*, 197 Cal.App.4th at p. 501.) When PAGA claims are involved, "the relief is in large part 'for the benefit of the general public rather than the party bringing the action' [citation]" (*ibid*.), and therefore a representative action "has 'significant institutional advantages' over a single claimant arbitration" (*id.* at p. 502). We agree with the *Brown* court's observation that because "[t]he representative action is a means for public enforcement of the labor laws . . . a single-claimant arbitration under the PAGA for individual penalties will not result in the penalties contemplated under the PAGA to punish and deter employer practices that violate the rights of numerous employees under the Labor Code." (*Ibid.*) As the *Brown* court correctly noted, "Other employees would still have to assert their claims in individual proceedings." (*Ibid.*)

41

However, *Concepcion* made it clear that the fact that enforcing a collective action waiver in an arbitration agreement might undermine the intended breadth of the effect of a state law such as PAGA is not a sufficient reason to invalidate a provision of an arbitration agreement that is subject to the FAA. Federal law preempts state law in this regard. (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S. Ct. 1747, 1750] [states cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons].) Although California may have valid reasons for allowing an individual employee to seek to recover penalties for Labor Code violations suffered by other employees, those reasons cannot trump enforcement of an arbitration agreement entered into between the employee and his or her employer.[15]

For these reasons, we conclude that the arbitration agreement's provision preventing Teimouri from arbitrating collective claims applies to her PAGA claim, and is

---

[15]    We also disagree with the *Brown* court's conclusion that permitting employees to "bring individual claims for Labor Code violations in separate arbitrations *does not serve the purpose* of the PAGA, even if an individual claim has collateral estoppel effects," such that "the benefits of private attorneys general actions to enforce state labor laws would, in large part, be nullified" by permitting only individual PAGA claims to be arbitrated. (*Brown, supra*, 197 Cal.App.4th at p. 502 (italics added).) Although enforcing an arbitration agreement as written (including enforcing its representative action waiver) might not serve the *broadest* law enforcement purposes of PAGA, it clearly does not undermine PAGA and certainly serves some law enforcement purpose, since there remains the possibility that an individual plaintiff will bring his or her claims and thereby enforce the state's labor laws with respect to any violations that he or she has suffered. Such an action would still provide a public benefit, albeit on a smaller scale than what might otherwise be possible in a representative PAGA action. Further, there would presumably still be a deterrent effect as the result of an individual claim, since the employer could face the prospect of other employees bringing identical individual claims.

42

enforceable. If Teimouri wishes to pursue her PAGA claims, she may do so only on an individual basis, in arbitration.

B.    *The other grounds that Teimouri raises*

Teimouri asserts that the trial court's order denying Macy's motion to compel individual arbitration may be affirmed on three independent bases: (1) that Macy's waived its right to arbitration; (2) that the arbitration agreement is unconscionable; and (3) that the class and representative waiver provisions violate the NLRB. We do not find any of these arguments to be persuasive.

1.    *Macy's did not waive arbitration*

Teimouri contends that this court can affirm the court's denial of the motion to compel arbitration on the ground that Macy's has waived any rights that it has under the arbitration agreement by failing to move for arbitration in a timely manner, and instead litigating this case for more than nine months after the suit was filed. The trial court found that Macy's did not waive its right to arbitrate, determining that "it was reasonable for [Macy's] to conclude that it would have been futile for them to compel arbitration prior to the holding in [*Concepcion*] . . . ."

Courts have concluded that " '[a] demand for arbitration must not be unreasonably delayed. . . . [A] party who does not demand arbitration within a reasonable time is deemed to have waived the right to arbitration. [Citations.]' [Citation.]" (*Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 992.) The party seeking to compel arbitration "ha[s] the responsibility to 'timely seek relief either to compel arbitration or

43

dispose of the lawsuit, before the parties and the court have wasted valuable resources on ordinary litigation.' [Citation.]" (*Id*. at pp. 993–994.)

"Generally, the determination of waiver [of the right to arbitrate] is a question of fact, and the trial court's finding, if supported by sufficient evidence, is binding on the appellate court. [Citations.] 'When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling.' [Citation.]" (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 (*St. Agnes*).) The parties do not discuss which standard of review should apply in this case. It appears that the essential underlying facts concerning Macy's actions prior to filing its motion to compel are not in dispute. However, under either standard of review, we conclude that the trial court did not err in its determination that Macy's did not waive its right to arbitration.

Both the FAA and California law reflect a strong policy favoring agreements to arbitrate. Both therefore require close judicial scrutiny of claims of waiver. (*St. Agnes*, *supra*, 31 Cal.4th at p. 1195.) The party seeking to establish waiver bears a heavy burden of proof, and any doubts regarding waiver should be resolved in favor of arbitration. (*Ibid*.)

Under both state and federal law, no single test delineates the conduct that will constitute a waiver of arbitration. Rather, there are a number of factors to which a court may look to determine whether waiver has occurred. (See *St. Agnes*, *supra*, 31 Cal.4th at p. 1195; see also *Cox v. Ocean View Hotel Corp.* (2008) 533 F.3d 1114, 1124 [quoting the factors to consider in determining whether there has been waiver of arbitration

44

identified in *St. Agnes*].) " 'In determining waiver, a court can consider "(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected, misled, or prejudiced' the opposing party." ' [Citation.]" (*St. Agnes*, *supra*, at pp. 1195–1196.)[16]

a. *Whether Macy's took actions inconsistent with the right to arbitrate*

As Teimouri points out, Macy's defended this case for more than nine months without moving to assert its rights under the arbitration agreement. Nonetheless, given the state of the law during this period of time, we conclude, as the trial court did, that Macy's actions were not necessarily inconsistent with the right to arbitrate and did not evidence an intent by Macy's to waive its rights under the arbitration agreement.

A court may find that a party has not acted inconsistently with its right to arbitrate when the party delayed seeking to enforce an arbitration agreement during a time when that agreement would have been considered unenforceable under existing law. (See *Fisher v. A.G. Becker Paribas Inc.* (9th Cir. 1986) 791 F.2d 691, 697 (*Fisher*); *Letizia v.*

---

16     We consider these factors in turn, although we note that many of the factors overlap to some degree, and, in particular, factors 1, 2 and 3 substantially overlap.

*Prudential Bache Securities, Inc*. (9th Cir. 1986) 802 F.2d 1185, 1187 (*Letizia*).) In

*Fisher*, the defendant moved to compel arbitration more than three years after the filing

of the lawsuit, did not raise arbitration as an affirmative defense, filed pretrial motions,

and engaged in extensive discovery. (*Fisher, supra,* at p. 693.) The defendant ultimately

moved to compel arbitration only after the United States Supreme Court rejected the so-

called "intertwining doctrine," under which arbitration of all claims was to be denied

where it was " 'impractical if not impossible to separate out nonarbitrable from arbitrable

contract claims.' [Citation.]" (*Id*. at pp. 694-695.) The *Fisher* court reasoned that the

defendant in that case had "properly perceived that it was futile to file a motion to compel

arbitration until" the United States Supreme Court finally rejected the intertwining

doctrine. (*Id*. at p. 695.) Given that the state of the law at the time gave the defendant

reason to believe that the arbitration agreement would not have been enforced, the *Fisher*

court concluded that the defendant's delay of more than three years should not be

interpreted as an act that was "inconsistent[] with a known existing right to compel

arbitration." (*Id*. at p. 697.)[17]

At the time Teimouri filed this case in June 2010, and until the United States

Supreme Court announced its decision in *Concepcion* on April 27, 2011, California law

---

[17]     *Letizia*, *supra*, 802 F.2d at page 1186, also involved the "intertwining doctrine."
As in *Fisher*, the *Letizia* court concluded that the defendant had not acted inconsistently
with its right to arbitrate simply because it had not sought to arbitrate claims that it
reasonably believed the court would not send to arbitration under then-existing law, and
moved to compel arbitration only after the Supreme Court rejected the "intertwining
doctrine." (*Letizia*, *supra*, at pp. 1186-1187.) The *Letizia* court concluded that the
change in the law brought about by the Supreme Court's intervening decision justified the
delayed motion to compel arbitration.

rendered a great number of class action waivers in employment arbitration agreements unenforceable. *Gentry* held that a class arbitration waiver was unenforceable where a court concludes "that a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration, and finds that the disallowance of the class action will likely lead to a less comprehensive enforcement of [wage and hour] laws for the employees alleged to be affected by the employer's violations . . . ." (*Gentry*, *supra*, 42 Cal.4th at p. 463.) In such circumstances, according to *Gentry*, the class arbitration waiver should be "severed and the rest of the arbitration agreement enforced." (*Id.* at p. 466.) This would effectively impose classwide arbitration on a defendant, as opposed to the individual arbitration contemplated by the parties' arbitration agreement.

In light of the holding in *Gentry*, it was reasonable for Macy's to have concluded that the trial court would not enforce the class action waiver in its arbitration agreement. Having reached that conclusion, Macy's chose not to immediately assert its rights under that agreement.

Defending against *individual claims* in arbitration differs in significant ways from defending against class and/or other representative or collective claims in arbitration. As the United States Supreme Court noted in *Concepcion*, "class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S. Ct. at p. 1751].) In addition, "class arbitration greatly increases risks to defendants," as "[t]he absence of multilayered review

47

makes it more likely that errors will go uncorrected." (*Id*. at p. ___ [131 S. Ct. at p. 1752].) Given the disadvantages of class arbitration, Macy's decision to forego attempting to enforce its arbitration agreement is understandable, since it reasonably perceived that given the holding in *Gentry*, it would be required to arbitrate Teimouri's claims on a classwide basis. Because Macy's reasonably believed that defending against only Teimouri's *individual* claims in arbitration was not an option available to it under existing California law, its failure to seek to enforce the arbitration agreement earlier in the case does not necessarily reflect an intent to forego that option.

When the United States Supreme Court held in *Concepcion* that the FAA preempts California's *Discover Bank* rule, the import of its holding for cases such as Teimouri's was that class action waivers in arbitration agreements might be enforceable as written. (See *Concepcion*, *supra*, 563 U.S. at p. ___ [131 S. Ct. at p. 1753].) After *Concepcion* was decided, Macy's had reason to believe that the court would enforce its arbitration agreement as written. Approximately a month and a half after *Concepcion* was decided, Macy's filed a motion to compel arbitration. Because Macy's did not delay for an unreasonable period after *Concepcion* overruled *Discover Bank* and thereby undermined much of the reasoning of *Gentry*, its earlier failure to seek to enforce its arbitration agreement did not reflect an intent to forego the right to seek arbitration.[18]

---

18    Other courts have similarly concluded that defendants did not act in a manner inconsistent with their right to arbitrate by delaying moving for arbitration until after *Concepcion* raised doubts about the continuing validity of *Gentry*. (See, e.g., *Quevedo, supra,* 798 F.Supp.2d 1122 [involving employee claims and same arbitration agreement as the arbitration agreement at issue in this case].)

48

Teimouri argues that this court should conclude that a "futility defense" must be considered to weigh against a finding of waiver only if the motion to compel arbitration would *necessarily* have been futile, and was not simply *likely* to be rendered futile by the state of the law at the time the party delayed moving for arbitration. In other words, according to Teimouri, California law requires that a defendant who delays seeking arbitration have been absolutely precluded from enforcing the arbitration provision before the defendant may rely on a change in the law to justify its delay in seeking to arbitrate the case.

Teimouri suggests that *Fisher*, *supra*, 791 F.2d 691 stands for the proposition that "[f]or the 'futility defense' to be effective, it must have been necessarily futile for the petitioning party to compel arbitration before the change of law." Teimouri misapprehends the holding in *Fisher*. *Fisher* is properly read as providing that the futility doctrine may be available to a party to justify its delay even where the relevant case law (i.e., the authority or authorities on which the party was relying in concluding that an arbitration agreement would not be fully enforced as written) is not entirely clear or is contradicted. At the time the plaintiffs initiated the lawsuit in *Fisher*, *supra*, at pages 694-695, the Ninth Circuit had indicated its approval of the "intertwining doctrine" only in dicta, in a footnote in a single case.[19] Although courts in other circuits had officially

19     The *Fisher* court acknowledged that the "intertwining doctrine" had not been clearly adopted as the law in the Ninth Circuit at the time the plaintiffs in *Fisher* filed their case: "We recognize that our approval of the intertwining doctrine was an 'even if' comment that was not necessary to a resolution of the issues in that case." (*Fisher*, *supra*, 791 F.2d at p. 695.) The *Fisher* court did not find this uncertainty to provide a reason for

49

adopted the "intertwining doctrine," it was not clear that a court in the Ninth Circuit would have prevented the enforcement of the arbitration agreement at issue in *Fisher* based on the "intertwining doctrine." (*Id*. at pp. 695–696.)[20] It was not until three years into the *Fisher* lawsuit that the Ninth Circuit squarely held that the "intertwining doctrine" was the law of that circuit. (*Id.* at p. 697.) The *Fisher* court did not conclude that the defendant should have challenged the "intertwining doctrine" at an earlier point in the litigation, even though the defendant could arguably have raised a good faith challenge. Rather, the court held that the defendant had properly perceived that it was futile to move to compel arbitration until the United States Supreme Court ultimately rejected the intertwining doctrine. (*Ibid*.)

We also reject Teimouri's reliance on *Roberts v. El Cajon Motors, Inc*. (2011) 200 Cal.App.4th 832 (*Roberts*), and *Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 447 (*Lewis*), to suggest that Macy's contention that it would have been futile for it to have sought to enforce the arbitration agreement is untenable. The *Roberts*

---

rejecting the defendant's contention that it would have been futile for it to compel arbitration prior to the time the "intertwining doctrine" was finally rejected by the United States Supreme Court. (*Ibid.* ["Nevertheless, the unmistakable import of our dicta in *De Lancie* was that an agreement requiring arbitration was unenforceable if state claims and securities law violations were intertwined"].)

20    In fact, some courts had rejected the "intertwining doctrine." (See e.g., *Lee v. Ply\*Gem Industries, Inc*. (D.C. Cir. 1979) 593 F.2d 1266, 1275, cert. denied 1979 441 U.S. 967 [in a proceeding involving antitrust and common law claims, the permeation doctrine provided no authority for a ruling that arbitrable claims become subject to adjudication in court merely because they are related to nonarbitrable claims]); *Dickinson v. Heinold Securities, Inc.* (7th Cir. 1981) 661 F.2d 638, 644 [better solution in cases with factually and legally related arbitrable and nonarbitrable claims was to stay the arbitration proceeding pending resolution of the litigation].)

court affirmed the trial court's determination that the defendant had waived its right to arbitrate the plaintiff's claims, in large part because the defendant had never even mentioned the existence of the arbitration agreement, nor the possibility that it might seek to enforce the arbitration agreement, until after it had engaged in a significant amount of litigation and had allowed the plaintiff to propound class-wide discovery. The *Roberts* court explained: "Indeed, if El Cajon *either* had promptly moved to compel arbitration at or near the time it answered the complaint *or informed Roberts at that time of its intention to compel arbitration (such as in its answer to the complaint)*, Roberts likely would not have propounded extensive written discovery involving the class action allegations in her complaint. Of course, if Roberts had been given timely notice by El Cajon of its intent to arbitrate and propounded the discovery in any event, it would have been at her peril." (*Roberts*, *supra*, at p. 846, italics added.) In this case, unlike *Roberts*, Macy's *did* inform Teimouri of the possibility that it would seek to compel arbitration, having raised the arbitration agreement as a defense in its answer to her complaint.

The *Roberts* court rejected the defendant's contention that it had not moved to compel arbitration in that case at an earlier time because it "was unsure of the state of the law regarding the enforceability of the waiver of classwide claims in the arbitration provision at issue here," and that its failure to do so should be excused for this reason. (*Roberts*, *supra*, 200 Cal.App.4th at p. 846, fn. 10.) Although the defendant in *Roberts* claimed that it was relying on *Concepcion* to support its position that it had been "unsure" of the state of the law, and that this is the reason it had delayed in seeking arbitration, it was significant to the *Roberts* court that "*Concepcion* was not decided until April 2011,

51

more than a year *after* El Cajon moved to compel arbitration." (*Ibid*.)  It was thus clear that something other than the holding in *Concepcion* had triggered the defendant's motion to compel arbitration, and its claims that its delay was attributable to the fact that it was not sure whether its arbitration provision would be enforced as written thus rang untrue. In addition, during the delay, the defendant attempted to "cherry-pick" members of the class by contacting them and offering to settle with them for $50 in return for a dismissal of all claims in the lawsuit.  (*Id*. at p. 846.)  Given these facts, it is not surprising that the *Roberts* court ultimately concluded that the defendant had acted inconsistently with an intent to arbitrate.  *Roberts* should not be read to preclude defendants in other cases from taking the position that prior to the holding in *Concepcion*, they had a reasonably justifiable belief that they would have been precluded from enforcing a class action waiver in an arbitration agreement.  Rather, a court considering whether a defendant was reasonably justified in believing that individual arbitration would have been foreclosed prior to *Concepcion* must consider all of the relevant circumstances, including the underlying facts and their similarity to the facts of *Gentry*, as well as the circumstances of the delay and the timing of the defendant's motion to compel individual arbitration in light of *Concepcion*.

Despite Teimouri's reliance on *Lewis*, our reading of the *Lewis* opinion supports our conclusion, as well.  Teimouri contends that *Lewis* provides that a futility defense must be rejected if a party's subjective belief that moving to compel arbitration prior to *Concepcion* would have been futile can be shown to have been erroneous by reference to cases in which courts have compelled arbitration under similar facts.  (*Lewis*, *supra*, 205

52

Cal.App.4th at pp. 447-448.) Teimouri thus suggests that *Lewis*, together with *Roberts*, forecloses an " 'erroneous-but-reasonable' belief defense that arbitration was futile pre-*Concepcion*." We disagree. The rule that *Lewis* sets forth is that a defendant may not rely on a "clearly erroneous interpretation of" the law in attempting to justify its delay in seeking to enforce an arbitration provision. (*Lewis*, *supra*, at p. 447 ["We reject Fletcher Jones's futility argument because it relies on a clearly erroneous interpretation of *Discover Bank* as invalidating all arbitration agreements that include a class action waiver"].) A "clearly erroneous" interpretation would obviously not constitute a reasonable interpretation of the law.

Based on these authorities, we reject the standard that Teimouri urges, i.e., that a defendant have been absolutely precluded from compelling arbitration in order to successfully assert a futility defense. Rather, the appropriate standard, in our view, is whether the party who delayed in seeking arbitration was *reasonably justified* in believing that the arbitration agreement would not have been enforced under then-existing law.

Teimouri offers two cases to support her contention that "a party *could* have successfully enforced an arbitration agreement with a class action waiver prior to *Concepcion*," suggesting that Macy's belief that the arbitration agreement in this case would not have been enforced as written was clearly erroneous. She suggests that *Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634 (*Walnut Producers*), and *Borrero v. Travelers Indemnity Co*. (E.D. Cal. Oct. 15, 2010, No. Civ. A-S-10-322-KJM) 2010 U.S. Dist. Lexis 114004 (*Borrero*), demonstrate that prior to

53

*Concepcion*, "California courts did in fact enforce arbitration agreements containing class action waivers over the objections of a party invoking *Gentry*." Rather than providing support for her position, these cases demonstrate the reasons for our conclusion that Macy's belief that it would have been required to engage in class arbitration under the circumstances of this case was *not* a clearly erroneous interpretation of the law, and was instead a reasonable interpretation of the law.

"[I]n *Walnut Producers*, the Court of Appeal found an arbitration agreement containing a class action waiver enforceable because the waiver did not act 'as an exculpatory clause or unduly hinder[] plaintiffs from pursuing a legal remedy' due to the value of each individual claim—approximately $43,000. [Citation.]" (*Lewis*, *supra*, 205 Cal.App.4th at p. 477.) Similarly, in *Borrero*, the plaintiff had not challenged the defendant's calculation that her potential total individual recovery exceeded $100,000. (*Borrero*, *supra*, 2010 U.S. Dist. Lexis at *7-*8.) Thus, in both of these cases, the first *Gentry* factor, i.e., whether the size of the potential individual recovery is so modest as to deter individual arbitration, weighed heavily in favor of enforcing the class action waiver. There has been no suggestion in this case that Teimouri's individual claims might provide for a potential recovery of anything close to this kind of award, making it far less likely that a court would have concluded under *Gentry* that the arbitration agreement's class and representative waiver should be enforced. Teimouri points to no other case in which, after *Discover Bank* and *Gentry* but prior to *Concepcion*, a court compelled individual arbitration under facts similar to the facts that exist in this case. It was thus more than reasonable for Macy's to assume that prior to *Concepcion*, a trial court in California

54

would have concluded that class arbitration in this context was "likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration," and that "the disallowance of the class action will likely lead to a less comprehensive enforcement of [wage and hour] laws for the employees alleged to be affected by the employer's violations . . . ." (*Gentry*, *supra*, 42 Cal.4th at p. 463.)

For these reasons, Macy's belief that California law regarding class action waivers in arbitration agreements would operate to invalidate the class action waiver in the arbitration agreement at issue in this case was not clearly erroneous, but instead, was reasonably justified. Given the holding in *Gentry*, Macy's was justified in believing that if it had moved to compel arbitration prior to the decision in *Concepcion*, it would have been required to arbitrate Teimouri's class and representative claims, in addition to her individual claims. Macy's failure to seek to enforce the arbitration provision under these circumstances was therefore not inconsistent with the right to individually arbitrate Teimouri's claims. We conclude that this factor does not weigh in favor of a determination that Macy's waived its rights under the arbitration agreement.

b. *Whether the litigation machinery has been substantially invoked*

Between the initiation of the lawsuit by Teimouri and the motion to compel individual arbitration, the parties engaged in very limited motion practice before the trial court, and some discovery.

Significantly, when Macy's filed its answer to the FAC on August 27, 2010, it specifically referred to the arbitration agreement that Teimouri had signed, and stated that

55

the FAC "should be dismissed or stayed" on that basis. After Macy's filed its answer, the parties did engage in some discovery. Specifically, Macy's propounded 21 form interrogatories and 17 special interrogatories, and also sent Teimouri a deposition notice, accompanied by 16 requests for production of documents. Teimouri provided responses to the form and special interrogatories. In addition, in response to Teimouri's 986 discovery requests, Macy's moved for a protective order. However, the record does not reflect that the trial court ruled on the request for a protective order prior to addressing Macy's motion to compel arbitration.

Other than this discovery, the record discloses that the parties engaged in a few other minor litigation matters, including stipulating to extend the May 26, 2011 class certification deadline and trial-related dates. However, neither party filed any dispositive motions, and Teimouri had not filed a motion for class certification prior to Macy's filing its motion to compel individual arbitration.

The litigation activity in which Macy's participated does not, in our view, constitute a "substantial" invocation of the trial court's "litigation machinery." In particular, given that Macy's reasonably believed that it would have been precluded from enforcing its arbitration agreement *as written* prior to the decision in *Concepcion*, Macy's fairly limited use of the judicial process to present a basic defense in this case during the period before *Concepcion* was decided should not be considered to be a "substantial" invocation of the litigation process. (Cf. *Fisher*, *supra*, 791 F.2d at p. 693 [no waiver found despite three-and-a-half-year delay, during which "both parties filed pretrial motions and engaged in extensive discovery," because defendant did not act

56

inconsistently with a right to arbitrate where it would have been futile to have sought arbitration under state of law at the time].)

        c.      *Whether Macy's delayed for a long period before seeking a stay*

Macy's moved for arbitration just over a year after Teimouri filed the complaint, and approximately nine months after Macy's filed its answer to the operative complaint. This year-long delay does not support a finding of waiver, given that Macy's reasonably believed that it had no right to enforce its arbitration agreement as written until *Concepcion* was filed in April 2011. We conclude that the more relevant time period to consider is the 44 days between the decision in *Concepcion* and the date Macy's moved to compel arbitration. A delay of approximately a month and a half cannot be considered to be an excessively long period, particularly in light of the open questions that still remain as to the scope of *Concepcion* as it relates to California law in the context of arbitration. It appears that once Macy's had a basis to conclude that it might be able to enforce the terms of the arbitration agreement, it acted within a reasonable time in seeking to enforce that agreement.

        d.      *Whether Macy's filed a counterclaim without seeking a stay*

Macy's has not filed a counterclaim against Teimouri. This factor thus weighs against a determination that Macy's waived its right to arbitrate.

        e.      *Whether important intervening steps have taken place*

The fifth factor identified in *St. Agnes* requires the court to consider whether "important intervening steps," such as the moving party taking advantage of judicial discovery procedures that would not otherwise be available in arbitration, have taken

57

place.  (*St. Agnes*, *supra*, 31 Cal.4th at pp. 1195–1196.)  Although there has been some discovery in this case, Macy's propounded only limited discovery, in the form of 38 interrogatories and 16 document requests in association with a notice for Teimouri to appear at a deposition.  Teimouri contends that the discovery that Macy's propounded exceeds what Macy's "would have been entitled to propound in arbitration," since the arbitration agreement allows for only 20 interrogatories.  Teimouri maintains  that "Macy's was therefore able to obtain evidence not otherwise available upon a timely demand to arbitrate."  Our review of the arbitration agreement and the interrogatories that Macy's propounded does not support Teimouri's claim.

First, although the arbitration agreement allows each party to propound 20 interrogatories as a matter of right, the agreement further provides that the arbitrator may permit either or both parties to engage in "additional relevant discovery" upon the "request of any party," "a showing of appropriate justification," and a finding by the arbitrator that the additional discovery is not "overly burdensome, and will not unduly delay the conclusion of the arbitration."  Thus, it is not at all clear that Macy's would not have been allowed to propound all 38 of its interrogatories in an arbitral forum.[21]  In addition, at least some of the interrogatories that Macy's propounded sought information pertaining to Teimouri's class or representative claims.  Macy's may not have had to

---

[21]    Propounding 38 interrogatories seems reasonable in the context of the multiple claims contained in Teimouri's complaint that alleged a variety of violations based on different factual premises, and particularly in comparison with the 986 discovery requests that Teimouri propounded in this action.

request all of the information that it sought in its 38 interrogatories if the parties had been engaged in the arbitration of Teimouri's individual claims, only.

Even assuming that the discovery and limited motion practice that has taken place in this litigation qualify as "important intervening steps," we would nevertheless conclude that these steps do not support a finding of waiver, for the same reason that the delay in Macy's motion to compel individual arbitration does not support a finding of waiver. Macy's participated in the litigation and permitted these "important . . . steps" to take place only because it reasonably believed that it had no meaningful alternative, given that under California law at the time Teimouri brought her action, the class/representative action waiver in the arbitration agreement was likely to have been found to be unenforceable.

        f.      *Whether the delay has prejudiced Teimouri*

Mere participation in litigation and discovery *without prejudice* does not compel a finding of waiver. (*Sobremonte*, *supra*, 61 Cal.App.4th at p. 995.) Under both California and federal law, the prejudice factor is critical in waiver determinations. (*St. Agnes, supra*, 31 Cal.4th at p. 1203.)

"[C]ourts will not find prejudice where the party opposing arbitration shows only that it incurred court costs and legal expenses." (*St. Agnes*, *supra*, 31 Cal.4th at p. 1203.) Rather, "[p]rejudice typically is found only where the petitioning party's conduct has substantially undermined th[e] important public policy [in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution] or substantially impaired the other side's ability to take advantage of the benefits and efficiencies of arbitration."

59

(*Ibid*.) For example, prejudice exists "where the petitioning party used the judicial discovery processes to gain information about the other side's case that could not have been gained in arbitration; . . . where a party unduly delayed and waited until the eve of trial to seek arbitration; . . . or where the lengthy nature of the delays associated with the petitioning party's attempts to litigate resulted in lost evidence." (*Ibid*.)

There has been no showing in this case of prejudice of the sort referred to in *St. Agnes*. Although Macy's propounded some basic discovery requests, it does not appear that Macy's unfairly gained information from Teimouri in this litigation that it could not have gained in arbitration. Nor can Macy's delay in seeking arbitration be considered to be "undue." Rather, Macy's delayed moving to compel arbitration for some months until it became apparent that it might be able to enforce the arbitration agreement by its terms, including the class arbitration waiver. Teimouri has not indicated that the delay has resulted in any lost evidence.

Teimouri contends that if the trial court had granted Macy's motion to compel individual arbitration, she "would have squandered a year in time, effort, and expenses, and would have disclosed strategy regarding the case's underlying merit that she would not have disclosed had the arbitration been timely demanded." The effort that Teimouri expended and the legal expenses that she incurred do not suffice to establish prejudice. (See *St. Agnes*, *supra*, 31 Cal.4th at p. 1203 ["Because merely participating in litigation, by itself, does not result in a waiver, courts will not find prejudice where the party opposing arbitration shows only that it incurred court costs and legal expenses"].) Further, Teimouri fails to share what "strategy regarding the case's underlying merit" she

claims to have disclosed during this litigation that she would not have disclosed if Macy's had sought individual arbitration of her claims at an earlier point in time, and we are unable to discern what it is that Teimouri now wishes she had not shared with Macy's that could undermine her approach to the arbitration of her individual claims.

Teimouri contends that "delay alone may constitute prejudice because the *delay itself* may deprive the non-moving party of the benefits of arbitration, that is, an efficient and cost-effective forum." Teimouri cites *Roberts*, *supra*, 200 Cal.App.4th at page 844, footnote 9, in support of this claim. In that footnote, *Roberts* identifies the existence of "some debate in our state" as to "whether delay alone is sufficient to establish 'prejudice' and a resulting waiver of arbitration." (*Ibid.*) The *Roberts* court explained:

> "In *Burton v. Cruise* [(2010)] 190 Cal.App.4th [939,] 947, the Court of Appeal noted that an 'egregious delay may result in prejudice' and concluded that to the extent there is a conflict between *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 996, which found the bank waived arbitration when it allowed its customers to spend 10 months preparing their case for trial at considerable expense and time, and *Groom v. Health Net* (2000) 82 Cal.App.4th 1189, which reversed an order denying arbitration after the petitioning party waited 11 months after the filing of the complaint to compel arbitration and demurred four times to the original and amended complaints, 'we believe that it is *Groom* [*v. Health Net*], not *Sobremonte* [*v. Superior Court*], which should be left standing at the altar.' (*Burton*, at p. 948.) The court in *Burton v. Cruise* concluded that *Groom v. Health Net* 'erred in failing to recognize that a petitioning party's conduct in stretching out the litigation process itself may cause prejudice by depriving the other party of the advantages of arbitration as an "expedient, efficient and cost-effective method to resolve disputes," ' and that '[a]rbitration loses much, if not all, of its value if undue time and money is lost in the litigation process preceding a last-minute petition to compel.' (*Ibid.*)" (*Roberts*, *supra*, 200 Cal.App.4th at p. 844, fn. 9.)

61

While we generally agree with the assessment provided in *Burton*, *supra*, 190 Cal.App.4th at page 947 and reaffirmed in *Roberts*, *supra*, 200 Cal.App.4th at page 844, footnote 9, that sufficient and egregious delay in the litigation process may cause prejudice to a non-moving party by depriving that party of the advantages of the expediency and cost-effectiveness of arbitration, any prejudice to Teimouri resulting from the delay in moving to compel arbitration in this case was attributable not simply to a lack of diligence on Macy's part in seeking arbitration at an earlier point in the process, but, rather, to the existence of a serious question concerning the enforceability of the arbitration agreement, as written. In the cases cited by the *Roberts* court to support the notion that delay, alone, may under some circumstances present sufficient prejudice to the party opposing arbitration, there was no *serious* question regarding the enforceability of the arbitration agreements. (See *Burton*, *supra*, at p. 947; *Sobremonte*, *supra*, 61 Cal.App.4th at p. 997.) The moving parties' delay in seeking arbitration in those cases was thus deemed to have been unjustified, in part because the parties' delay suggested that they were attempting to game the system, as opposed to making a reasonable decision not to attempt to enforce an arbitration agreement that was likely to be held unenforceable. (See, e.g., *Guess?, Inc. v. Superior Court* (2000) 79 Cal.App.4th 553, 558 ["Simply put, ' "[t]he courtroom may not be used as a convenient vestibule to the arbitration hall so as to allow a party to create his own unique structure combining litigation and arbitration." ' [Citation.]"].) This is not the situation in the present case, and we will not infer that prejudice arose from the mere fact that there was a delay

62

between the filing of the action and Macy's motion to compel individual arbitration of Teimouri's claims.

Generally, cases in which a party has been found to have waived its right to arbitration have involved situations in which defendants have unduly delayed moving for arbitration without reasonable justification. Macy's had a reasonable justification for not moving to compel arbitration immediately upon the filing of the lawsuit, and, when that justification no longer existed as a result of the decision in *Concepcion*, it moved for individual arbitration with minimal delay. Under these circumstances, Macy's cannot be said to have intentionally undermined the speedy and efficient nature of arbitration by its actions. In addition, unlike the defendant in *Roberts*, *supra*, 200 Cal.App.4th at page 846, Macy's *did* raise the possibility that it would seek arbitration in its answer to Teimouri's complaint, thereby putting Teimouri on notice that arbitration of her claims was a possibility. For these reasons, we conclude that Teimouri has not met her "heavy burden" to show that Macy's waived its rights under the arbitration agreement. We therefore reject waiver of the right to arbitrate as a separate basis for affirming the trial court's order denying Macy's motion to compel individual arbitration.

2.      *The arbitration agreement is generally enforceable and is not unconscionable*

Teimouri contends that the trial court could have denied Macy's motion to compel arbitration on the alternative ground that the arbitration agreement is generally unconscionable and therefore should not be enforced, and that this court can affirm the trial court's ruling on this basis.

63

Under the FAA, "written arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " (*Doctor's Assocs., Inc. v. Casarotto* (1996) 517 U.S. 681, 686, italics omitted.) "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements . . . ." (*Id.* at p. 687.) Under generally applicable California law, "courts may refuse to enforce an unconscionable arbitration agreement." (*Ingle v. Circuit City Stores, Inc.* (9th Cir. 2003) 328 F.3d 1165, 1170 (*Ingle*).) "Unconscionability refers to 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' [Citations.]" (*Ibid.*)

"Unconscionability has both procedural and substantive elements. [Citations.] Although both must appear for a court to invalidate a contract or one of its individual terms [citations], they need not be present in the same degree: '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' [Citations.]" (*Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1469.) The procedural element focuses on the contracting parties' unequal bargaining power and on the weaker party's lack of notice of hidden or oppressive terms; the substantive element focuses on the actual presence of one-sided or oppressive terms. (*Armendariz*, *supra*, 24 Cal.4th at p. 114.)

a.      *Procedural unconscionability*

"The procedural element [of unconscionability] addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power." (*Pinnacle, supra,* 55 Cal.4th at p. 246.) " ' "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." ' [Citation.]" (*Id.* at p. 247.)

"The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, ' "which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." ' [Citation.]" (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071.) However, even in adhesion contracts, courts may enforce provisions that are conspicuous, plain, and clear, and that do not "operate to defeat the reasonable expectations of the parties." (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710.) Thus, courts consider the lack of negotiating and bargaining power, as well as the factor of surprise.

As the California Supreme Court has explained, "there are degrees of procedural unconscionability." (*Gentry*, *supra*, 42 Cal.4th at p. 469.)

> "At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability. Although certain terms in these contracts may be construed strictly, courts will not find these contracts substantively unconscionable, no matter how one-sided the terms appear to be. [Citations.] Contracts of adhesion that involve surprise or other sharp practices lie on the other end of the spectrum. [Citation.]

65

Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching.' [Citation.]" (*Ibid.*)

In *Quevedo*, *supra*, 798 F.Supp.2d at pages 1136-1138, a federal district court concluded that the same arbitration agreement at issue in this case—Macy's employment arbitration agreement—is not " 'entirely free from procedural unconscionability.' " (*Id.* at p. 1138, quoting *Gentry*, *supra*, 42 Cal.4th at p. 472.) We agree with the *Quevedo* court's analysis and conclusion in this regard.

Specifically, the arbitration materials at issue here, like the agreement in *Gentry*, contain a one-sided explanation of the benefits of arbitration without offering the drawbacks and also make it clear that Macy's would prefer that its employees agree to arbitration of their disputes.

With respect to the one-sided explanation of the benefits of arbitration, the Solutions InSTORE brochure describes arbitration as "a lot like a court proceeding, but . . . less formal, less time-consuming and less expensive." The brochure tells employees that "[t]he same remedies are available to you as in a court of law" and proceeds to explain that arbitration offers "several other advantages and benefits for you [the employee]." Below that statement, the brochure has a chart in which arbitration is compared to a "court of law." The chart states that "[a]n independent arbitrator from outside the Company, specially qualified to hear employment related disputes" hears claims in arbitration, while "[a] judge who may not specialize in employment law or [a] jury who is completely unfamiliar with and has no specific training in employment law"

66

hears claims in a court. Further, the chart informs employees that the filing fee for arbitration is no more than $125, while the filing fee in federal court is $350, and the filing fee in state courts can be $150 or more. The chart indicates that employees who arbitrate their claims "can receive up to $2,500 per rolling calendar year" for legal fees in arbitration, while those who bring claims in court get no "legal financial benefit." Finally, the chart explains that employees are not required to have an attorney in arbitration, although they may have one, and states that "[t]he tone of an Arbitration proceeding is much less formal than a court of law," and that "the legal system is much more formal and complex, often requiring you to obtain legal representation to manage through the system."

It is clear that these descriptions highlight the benefits of arbitration, while failing to alert employees to the potential downsides of foregoing the rights available in a court, such as having a jury decide claims, the ability to engage in more extensive discovery, and the right to appeal. (*Quevedo*, *supra*, 798 F.Supp.2d at p. 1137.) In addition to highlighting the benefits of arbitration, the language used to describe the arbitration program makes it appear that Macy's is offering its employees an advantage by providing them with the opportunity to arbitrate employment disputes. For example, the brochure tells employees, "If you decide you want to be excluded from participating in *and receiving the benefits of* Step 4 [arbitration], we need you to tell us in writing . . . ." (Italics added.) The brochure then provides a warning of sorts to employees, stating that if they opt out of arbitration within the 30-day time period, they will "no longer . . . be eligible for the benefits available under the [sic] Step 4: Arbitration process." By

67

suggesting that an employee who opts out will no longer be "eligible" for some "benefit," the materials imply that the employee would be losing something desirable, without informing the employee about the potential negative consequences of agreeing to arbitrate. On the whole, Macy's portrayal of its arbitration program, like the portrayal of the program at issue in *Gentry*, discloses only the advantages of arbitration without informing employees about the potential disadvantages of arbitration.

As in *Gentry*, the Brochure and Plan Document that Macy's provided to newly hired employees to describe the InSTORE Program has the additional effect of implicitly pressuring new employees not to opt out, even if they might prefer to litigate their potential future claims, by informing them that Macy's prefers the arbitration program. A second comparison chart highlights the shorter "length[s] of time to final hearing," lower "company cost[s]," and lower "employee cost[s]" of arbitration as compared to litigation. The second chart states that "[a]rbitration can provide better access to justice for individual employee claims that are not economical for an attorney to take to court" and that "[a]rbitration is faster, cheaper and more satisfying for parties than traditional litigation." These statements not only suggest to the employee that arbitration is beneficial to the employee, but make clear to the employee that even if the employee might be inclined to opt out of arbitration, Macy's would prefer that the employee agree to arbitrate the employee's claims. In addition, like the description of arbitration in *Gentry*, "[t]he fact that the arbitration agreement was structured so that arbitration was the default dispute resolution procedure from which the employee had to opt out underscored [the employer's] proarbitration stance." (*Gentry*, *supra*, 42 Cal.4th at p.

68

472.) "Given the inequality between employer and employee and the economic power that the former wields over the latter [citation], it is likely that . . . employees felt at least some pressure not to opt out of the arbitration agreement." (*Ibid.*)

Both the Macy's agreement and the materials used to inform new employees about the arbitration program and their ability to opt out of the program lack material information about the disadvantages of the arbitration program *and* are likely to place some pressure on employees not to opt out, even if those employees might otherwise be inclined to opt out, making the arbitration materials in this case similar to the agreement and materials that the *Gentry* court concluded were not entirely free of procedural unconscionability. (*Gentry*, *supra*, 42 Cal.4th at p. 472.)

Teimouri also contends that the arbitration agreement is procedurally unconscionable because it was" buried" in a packet of hiring paperwork and because no one from Macy's explained the arbitration agreement to Teimouri, including the fact that she would be forfeiting certain substantive rights, such as the rights to a jury trial and to collective action. Teimouri cites to *Ontiveros v. DHL Express (USA), Inc.* (2008) 164 Cal.App.4th 494 (*Ontiveros*), in support of her contention that these factors rendered the arbitration agreement procedurally unconscionable. However, *Ontiveros* does not support Teimouri's argument and in fact, demonstrates why the presentation of the arbitration agreement in this case was not procedurally unconscionable on these grounds. In *Ontiveros*, *supra*, at page 508, the plaintiff had denied knowing that she had even signed an arbitration agreement, and the court determined that certain factors in that case supported her contention. Specifically, the fact that the arbitration agreement

69

"consist[ed] of a single-page document in a small font" (*id*. at p. 499) that had been included in a stack of other paperwork that the plaintiff had been required to sign immediately, "the lack of time for any real review of the documents" (*id*. at p. 508), and "the failure of anyone to explain the significance of the agreement" (*ibid.*) all supported the plaintiff's claim that she was unaware that she had signed an arbitration agreement. In contrast, in this case, Macy's presented Teimouri with a separate, relatively easy-to-read booklet that explains the entire InSTORE Program, including the arbitration step. That booklet included information about the substantive rights that employees give up by agreeing to arbitrate their claims. Most significantly, Teimouri had 30 days to review the documentation and opt out of the arbitration provision. Teimouri thus had more than enough time to review the arbitration agreement, and, unlike the plaintiff in *Ontiveros*, could have chosen to opt out at a later point in time. We therefore reject Teimouri's contention that the manner in which the arbitration agreement was presented to her rendered the agreement procedurally unconscionable.

Based on all of these circumstances, including the nature of the documents and the manner in which they were presented to Teimouri and other employees, we conclude that the arbitration agreement at issue here involves a minimal degree of procedural unconscionability.

### b. *Substantive unconscionability*

The fact that some degree of procedural unconscionability may be present in an arbitration agreement does not necessarily render the arbitration agreement unenforceable. The court must consider whether the substantive terms of the agreement

70

are so one-sided or oppressive as to be substantively unconscionable. " 'Substantive unconscionability' focuses on the terms of the agreement and whether those terms are 'so one-sided as to "shock the conscience." ' [Citations.]" (*Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1331.)

Teimouri asserts that the Macy's arbitration agreement "contains at least four substantively unconscionable terms." Specifically, Teimouri contends that the agreement: (1) gives Macy's the authority to unilaterally cancel or modify the program; (2) lacks "operational mutuality"; (3) includes a confidentiality clause that favors Macy's; and (4) includes a broad delegation clause.

i. *Unilateral right to cancel or modify*

The Solutions InSTORE program allows Macy's to alter the program's rules and procedures, or to cancel the program entirely, upon giving employees 30 days' written notice. In *Ingle*, *supra*, 328 F.3d at page 1179, the Ninth Circuit held this type of provision to be substantively unconscionable, stating a "provision affording [an employer] the unilateral power to terminate or modify the [arbitration] contract is substantively unconscionable."[22]

The arbitration agreement contains a severability provision that states: "In the event any of these Solutions InSTORE Early Dispute Resolution Rules and Procedures are held to be unlawful or unenforceable, the conflicting rule or procedure shall be

---

[22] The *Ingle* court did not address whether the existence of this term, by itself, would render the entire arbitration contract unenforceable. (*Ingle, supra,* 328 F.3d at p. 1179, fn. 23.)

71

modified automatically to comply with applicable law," thereby indicating that should it be necessary to do so, this provision could potentially be severed from the rest of the arbitration agreement  Based on the Ninth Circuit's opinion in *Ingle*, the *Quevedo* court determined that the provision of the Macy's arbitration agreement that grants Macy's the unilateral right to cancel or modify the terms of the program is substantively unconscionable, but further determined that the court did not have to decide whether this provision was unenforceable because even if it was, the court could sever it from the remainder of the agreement.  (*Quevedo*, *supra*, 798 F.Supp.2d 1138-1139.)  The *Quevedo* court therefore concluded that the provision did not render the entire arbitration agreement unenforceable.  (*Id*. at p. 1139.)  We agree with this assessment.  There has been no suggestion that Macy's utilized this provision to undermine Teimouri's claims or to alter the terms under which the arbitration is to take place.  We conclude that the inclusion of this provision, alone, does not render the entire agreement sufficiently substantively unconscionable so as to make it unenforceable.[23]  We next turn to Teimouri's other contentions concerning substantive unconscionability.

ii.     *Lack of mutuality*

Teimouri contends that although the arbitration provision, on its face, appears to be mutual in that it theoretically applies to both the employee and Macy's, in practice, the arbitration agreement favors Macy's.  According to Teimouri, "Macy's specifically

---

[23]     We discuss in part III.B.2.b.v., *post*, whether the substantive unconscionability of this provision, in combination with at least one other unconscionable provision renders the entire agreement unenforceable, or whether the offending provisions may be severed.

requires 'employment-related disputes' to be subject to arbitration, which notably leave out charges that a retailer like Macy's typically have against an employee, including property damage and conversion."

An arbitration agreement that "compels arbitration of the claims employees are most likely to bring against [the employer]" but "exempts from arbitration the claims [the employer] is most likely to bring against its employees" may be considered substantively unconscionable. (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 176 (*Mercuro*); see also *Ferguson v. Countrywide Credit Indus.* (9th Cir. 2002) 298 F.3d 778, 785 (*Ferguson*).) In both *Mercuro* and *Ferguson*, the courts found Countrywide's arbitration agreement substantively unconscionable because it specifically excluded from its coverage claims "for intellectual property violations, unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information." (*Ferguson*, *supra*, at p. 785; *Mercuro*, *supra*, at p. 176.)

However, an arbitration agreement is not required to mandate the arbitration of all claims between an employee and employer in order to avoid being deemed unconscionable. Rather, "an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences." (*Armendariz, supra,* 24 Cal.4th at p. 120.) What is required is that an arbitration provision offer a " 'modicum of bilaterality.' " (*Id*. at p. 119.)

The arbitration agreement in this case provides for more than a " 'modicum of bilaterality.' "  The agreement states that "[e]xcept as otherwise limited, all employment-related legal disputes, controversies or claims arising out of, or relating to, employment or cessation of employment, whether arising under federal, state or local decisional or statutory law ('Employment-Related Claims'), shall be settled exclusively by final and binding arbitration."[24]  The agreement later states that "[a]rbitration shall apply to any and all such civil disputes, controversies or claims asserted *by the Company against the Associate*."  (Italics added.)  The arbitration provision thus generally applies equally to Macy's and the employee.[25]

The fact that the arbitration provision does not specifically carve out an exemption for certain claims in a manner that benefits Macy's is significant.  Teimouri relies on *Abramson v. Juniper Networks, Inc*. (2004) 115 Cal.App.4th 638, 665 (*Abramson*), *Palmer v. Infosys Techs., Ltd*., *Inc*. (M.D.Ala. 2011) 832 F.Supp.2d 1341, 1345-1346

---

[24]     Our review of the agreement suggests that the language "[e]xcept as otherwise limited" refers to the class and collective action waiver, as well as to "[c]laims by Associates that are required to be processed under a different procedure pursuant to the terms of an employee pension plan or employee benefit plan," "[c]laims by Associates for state employment insurance," and claims "under the National Labor Relations Act."

[25]     Teimouri provides no authority to support her contention that claims for "property damage and conversion" are "charges that a retailer like Macy's may typically have against an employee" or that such claims are necessarily excluded from the terms of the arbitration agreement.  Even if one were to assume that a major portion of Macy's claims against employees are claims for property damage and/or conversion, we see no basis to conclude that such claims would not be subject to arbitration.  An employee who damaged Macy's property and/or converted it would likely have done so by virtue of his or her employment with Macy's and such a claim would therefore likely be deemed to be related to that employee's employment.

(*Palmer*), and *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1147 (*Samaniego*) as support for her claim that agreements that are mutual on their face may nevertheless be unconscionable because they lack operational mutuality by exempting from arbitration claims typically brought by employers.  All of the cases on which Teimouri relies are distinguishable from this case on this basis.  Although the contract in *Samaniego* included general language that suggested mutuality, in that it purported to cover "[a]ny dispute or claim arising from any provision of this Agreement or relating in any way to the business relationship between Flooring Install and the Subcontractor" (*Samaniego*, *supra*, at p. 1142), the court noted that another provision of the contract "exempts from the arbitration requirement claims typically brought by employers— namely, those seeking declaratory and preliminary injunctive relief to protect Empire's proprietary information and noncompetition/nonsolicitation provisions—while restricting to arbitration any and all claims plaintiffs might bring."  (*Id.* at pp. 1142, 1147.)

Similarly, in *Palmer*, *supra*, 832 F.Supp.2d at pages 1345-1346, the court noted that despite the fact that the arbitration agreement ostensibly required that "all disputes between Infosys and Palmer, regardless of who asserts the claim, shall be decided by an arbitrator" (*id*. at p. 1345), the agreement proceeded to specifically list the types of claims that would be decided by an arbitrator and those that the parties could bring in a court of law.  The *Palmer* court observed that the types of claims to be decided by an arbitrator were claims that "rely on antidiscrimination or labor statutes protecting employee rights" (*ibid*.), while the claims for which a party could seek injunctive relief in court were claims "relating to intellectual property or trade secrets."  (*Id*. at p. 1346.)  The *Palmer*

75

court observed, "While these provisions are fair on their face, it is obvious that the types of claims that must be arbitrated are those most commonly brought by an employee, while those likely initiated by an employer can be filed in court." (*Ibid.*)

The contract addressed in *Abramson*, *supra*, 115 Cal.App.4th at pages 664-665, included a similar carve-out of certain types of claims, which were those most likely to be brought by employer against an employee: "Both provisions require the parties to arbitrate all claims—except those related to trade secrets, confidential information, and other intellectual property." (*Ibid.*) The *Abramson* court rejected the defendant employer's contention that the carve-out applied equally to both parties, noting that in the offer made to employees, the "carve-out is explicitly unilateral" because it "grants only 'the Company' the right to seek injunctive relief in court for 'misuse or appropriation of the Company's trade secrets or confidential and proprietary information.' " (*Ibid.*) Although the employment contract "nominally grant[ed] 'both parties' the right to seek judicial relief" (*ibid.*), the rest of the provision was clearly one-sided, requiring the employee to assent to a judicial forum for the determination of "all claims that the employer would be likely to assert against the employee" (*ibid.*), such as those arising from the protection of intellectual property. (*Ibid.*, italics omitted.) The *Abramson* court determined that the carve-out provision in the employment contract "addresses only the employee's breach of covenants designed to protect only the employer's interests," and as a result it "lacks mutuality, both facially and operationally." (*Ibid.*, italics omitted.)

Unlike the arbitration agreement in these cases, there is no carve-out for certain types of claims in the arbitration agreement at issue in this case. Rather, the agreement

applies broadly to any claims arising out of the employment relationship between an employee and Macy's, and does not unfairly protect Macy's interest in asserting its claims in court while relegating those claims likely to be brought by an employee to an arbitral forum. We therefore reject Teimouri's contention that the arbitration agreement lacks sufficient mutuality.

iii.    *Confidentiality*

Teimouri contends that the confidentiality provision in the arbitration agreement favors Macy's. She cites *Davis v. O'Melveny & Myers* (2007) 485 F.3d 1066, 1078 (*Davis*), in which the court determined that a confidentiality clause favored the defendant to a degree that rendered it unconscionable. The confidentiality clause at issue in *Davis* precluded the "mention to anyone 'not directly involved in the mediation or arbitration' of 'the content of the pleadings, papers, orders, hearings, trials, or awards in the arbitration' or even 'the existence of a controversy and the fact that there is a mediation or an arbitration proceeding.' " (*Ibid.*) The *Davis* court recognized that "[s]uch restrictions would prevent an employee from contacting other employees to assist in litigating (or arbitrating) an employee's case," and "would handicap if not stifle an employee's ability to investigate and engage in discovery." (*Ibid.*) As a result of the restrictions in the confidentiality agreement, the defendant would be " 'in a far superior legal posture' " because every individual employee would be prevented from "accessing precedent while allowing O'Melveny to learn how to negotiate and litigate its contracts in the future." (*Ibid.*) The court concluded that the breadth of the confidentiality provision rendered it substantively unconscionable. (*Ibid.*)

Teimouri also relies on *Grabowski v. C.H. Robinson Co.* (2011) 817 F.Supp.2d 1159, 1176 (*Grabowski*), to argue that the confidentiality provision in Macy's arbitration agreement is overly broad, rendering it substantively unconscionable. She contends that the confidentiality provision in *Grabowski*, which the *Grabowski* court determined was substantively unconscionable, is "almost identical" to the confidentiality provision here. The confidentiality provision in *Grabowski* provided:

> "All aspects of the arbitration, including without limitation, the record of the proceeding, are confidential and shall not be open to the public, except (a) to the extent both Parties agree otherwise in writing, (b) as may be appropriate in any subsequent proceedings by the Parties, or (c) as may otherwise be appropriate in response to a governmental agency or legal process, provided that the Party upon whom such process is served shall give immediate notice of such process to the other Party and afford the other Party an appropriate opportunity to object to such process.
>
> "At the request of a Party or upon his or her initiative, the Arbitrator shall issue protective orders appropriate to the circumstances and shall enforce the confidentiality of the arbitration as set forth in this article." (*Ibid.*)

The confidentiality provision in the arbitration agreement at issue here provides:

> "All aspects of an arbitration pursuant to these Solutions InSTORE Early Dispute Resolution Rules and Procedures, including the hearing and recording of the proceeding, shall be confidential and shall not be open to the public. The only exceptions are: (i) to the extent both parties agree otherwise in writing; (ii) as may be appropriate in any subsequent proceeding between the parties; or (iii) as may otherwise be appropriate in response to a governmental agency, legal process, or as required by law.
>
> "All settlement negotiations, mediations, and any results shall be confidential."

78

Macy's acknowledges that the confidentiality provision at issue in this case and the one at issue in *Grabowski* are "somewhat similar." However, relying on *Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 714 (*Chin*), Macy's contends that the inclusion of the "as required by law" disclosure exception makes the agreement in this case sufficiently different from the confidentiality agreements at issue in *Davis* and *Grabowski* to render it not unconscionable.

The *Chin* court determined that the confidentiality agreement in that case did "not raise colorable claims of unconscionability," in part because the confidentiality agreement would "not apply when disclosure is required by law . . . ." (*Chin*, *supra*, 194 Cal.App.4th at p. 714.) In *Chin*, however, the plaintiff was not complaining of the problem addressed in *Davis* and *Grabowski*—i.e., that the confidentiality provision might handicap employees and provide a benefit to the employer in the form of knowledge resulting from repeated cases brought by different employees. Rather, the plaintiff in *Chin* cited a concern about the possibility of the "unfairness of the 'repeat player effect,' *where an employer derives an advantage from repeatedly appearing before the same arbitrators*." (*Chin*, *supra*, at p. 714, italics added.) In response to the plaintiff's complaint, the *Chin* court noted that under at least one provision of the Code of Civil Procedure, a plaintiff could seek information from an arbitrator revealing information such as " '[t]he names of the parties to all prior or pending noncollective bargaining cases involving any party to the arbitration or lawyer for a party for which the proposed neutral arbitrator served or is serving as neutral arbitrator, and the results of each case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing

party, the names of the parties' attorneys and the amount of monetary damages awarded, if any.' " (*Chin*, *supra*, at p. 714, fn. 4, quoting Code Civ. Proc., § 1281.9, subd. (a)(4).) The "as required by law" language in the confidentiality agreement at issue in *Chin* would thus permit the plaintiff to identify those arbitrators before whom the defendant had appeared a number of times, thereby addressing the plaintiff's concern. The *Chin* court did not address the issue that Teimouri raises concerning the confidentiality agreement. *Chin* therefore provides no assistance in determining whether the confidentiality provision in Macy's arbitration agreement should be considered substantively unconscionable.

The slight differences between the confidentiality provision here and the one considered in *Grabowski* are not sufficient to remediate the problems identified in *Davis* and *Grabowski*. As in those cases, the provision is likely to unfairly benefit an employer such as Macy's, to the detriment of individual employees. We therefore conclude that the confidentiality provision is substantively unconscionable.

Macy's argues that if this court determines that the confidentiality provision is substantively unconscionable, we may "sever the provision from the remainder of the agreement." We discuss whether the substantive unconscionability of the confidentiality provision undermines the entire agreement or whether that and/or other unconscionable provisions may be severed in part III.B.2.b.v., *post*.

iv.     *Broad delegation clause*

Teimouri contends that the arbitration agreement "delegates the determination of unconscionability—whether the arbitration clause itself is enforceable—to the arbitrator

80

himself, who has every incentive to find such a clause enforceable." She cites the following language of the arbitration provision as being too broad a delegation clause: "all employment-related legal disputes, controversies or claims arising out of, or relating to, employment or cessation of employment . . . shall be settled exclusively by final and binding arbitration."

Under the FAA, the enforceability of an arbitration agreement is ordinarily to be determined by the court. However, the parties may agree in an arbitration provision that the issue of enforceability is to be determined by the arbitrator. (See, e.g., *AT&T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 649.)

Although too broad a delegation clause may be found to be unconscionable if it purports to delegate issues of formation to the arbitrator (see *Chin*, *supra*, 194 Cal.App.4th at p. 707; *Ontiveros, supra,* 164 Cal.App.4th at pp. 503-505), we conclude that Teimouri has misinterpreted the delegation clause at issue in this case as granting the arbitrator the authority to determine whether the arbitration agreement itself is enforceable. The arbitration agreement at issue in *Ontiveros* stated that the arbitrator " 'shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation' " of the agreement. (*Ontiveros*, *supra*, at p. 503.) Similarly, the arbitration agreement at issue in *Chin* provided, " 'Any dispute that arises out of or relates directly or indirectly to this Agreement or the relationship of the parties hereto, including, without limitation, any claimed breach of this Agreement or any claim that any part of this Agreement (including this Section 16.8 or any part thereof) is invalid, illegal, voidable or void, shall be resolved by arbitration . . . .' " (*Chin*, *supra*, at

81

p. 707.)  In contrast to the broad delegation language that was determined to be unconscionable in *Ontiveros* and *Chin*, the language in the arbitration agreement in this case does not purport to grant to the arbitrator the authority to resolve disputes over the interpretation, enforceability, formation, or legality of the arbitration agreement.

Given that the United States Supreme Court has cautioned that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so [citation]" (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944), we reject Teimouri's contention that the arbitration agreement's delegation clause "delegates the determination of unconscionability" to the arbitrator and is therefore substantively unconscionable.

<blockquote>v.    *The substantively unconscionable terms do not render the entire agreement unenforceable*</blockquote>

We have identified two provisions in the arbitration agreement as being substantively unconscionable—the provision granting Macy's the unilateral right to cancel or modify the terms of the agreement, and the broad confidentiality provision. However, the fact that the arbitration agreement contains these flawed provisions does not *necessarily* mean that the entire arbitration agreement is substantively unconscionable.  Rather, it may be possible to sever one or both of the unconscionable provisions.  The arbitration agreement itself provides for such a remedy, as does California law.  (See Cal. Civ. Code, § 1670.5, subd. (a) ["If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of

the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result"].) The question we must address is whether the offending clause or clauses are merely "collateral" to the main purpose of the arbitration agreement, or instead, whether the arbitration agreement is " 'permeated' " by substantive unconscionability, such that the entire agreement may not be enforced. (*Armendariz, supra,* 24 Cal.4th at pp. 123-124.)

We conclude that the "central purpose of the contract" at issue in this case is not "tainted with illegality"; rather, the illegality is found in provisions that are "collateral to the main purpose of the contract." (*Armendariz*, *supra*, 24 Cal.4th at p. 124.) Given the overall fairness of the arbitration agreement, we conclude that Macy's unilateral right to terminate or modify the agreement and/or the broad confidentiality provision, taken alone or in combination, do not render the agreement so substantively unconscionable as to be wholly unenforceable, particularly given the relatively low level of procedural unconscionability of the agreement. Rather, these two substantively unconscionable terms may be severed from the remainder of the agreement without substantially affecting the manner in which the agreement operates.

We therefore reject Teimouri's contention that this court may affirm the trial court's order denying Macy's motion to compel individual arbitration on the ground that the arbitration agreement is unconscionable.

3. *The policy does not violate the National Labor Relations Act*

Teimouri suggests that we may uphold the trial court's order denying Macy's motion to compel individual arbitration of her claims based on provisions of the National

83

Labor Relations Act (29 U.S.C. § 151 et seq. (NLRA)), as interpreted in *D.R. Horton* (2012) 357 NLRB No. 184 (2012 NLRB Lexis *11) (*D.R. Horton*).

In *D.R. Horton*, the National Labor Relations Board (NLRB) considered whether a mandatory arbitration agreement that required that all employment-related disputes be resolved through individual arbitration, and that precluded class litigation and arbitration, violated the NLRA. The NLRB concluded that the arbitration agreement violated the NLRA because it prohibited the exercise of substantive rights protected by section 7 of the NLRA. (*D.R. Horton*, *supra*, 2012 NLRB Lexis at *1.) Section 7 of the NLRA provides in part that employees shall have the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." (29 U.S.C. § 157.) The NLRB determined that "employees who join together to bring employment-related claims on a class-wide or collective basis in court or before an arbitrator are exercising rights protected by Section 7 of the NLRA." (*D.R. Horton*, *supra*, at *3.) The NLRB further concluded that the FAA did not preempt its interpretation of the NLRA as rendering class arbitration waivers of employment-related disputes unenforceable. (*D.R. Horton*, *supra*, at *7-*12.)

A number of courts have found the NLRB's analysis in *D.R. Horton* to be unpersuasive. (See, e.g., *Truly Nolen*, *supra*, 208 Cal.App.4th at pp. 514-515; *Nelsen v. Legacy Partners Residential, Inc.* (2012) 207 Cal.App.4th 1115, 1134-1135; *Jasso v. Money Mart Express, Inc*., *supra*, 879 F.Supp.2d at pp. 1046-1047.) These courts refer to the United States Supreme Court's decision in *CompuCredit Corp. v. Greenwood, supra,* 565 U.S. ___ [132 S.Ct. 665], in which the court held that a federal statute will not be

84

found to override an arbitration agreement under the FAA unless such a congressional intent can be shown with clarity in the language or legislative history of the statute. (*Id.* at pp. ___-___ [132 S.Ct. at pp. 672-673].) Teimouri has pointed to no language in the NLRA demonstrating that Congress intended that the Act override the terms of an arbitration agreement under the FAA. We agree with the courts that have rejected the NLRB's analysis in *D.R. Horton*, and find this argument unavailing as a basis for affirming the trial court's order.

## IV.

## DISPOSITION

The order of the trial court denying Macy's motion to compel individual arbitration of Teimouri's claims is reversed. The parties are to bear their own costs on appeal.

_____

AARON, J.

I CONCUR:

_____

McCONNELL, P. J.

HALLER, J., concurring:

After *AT&T Mobility LLC v. Concepcion* (2011) 131 S.Ct. 1740, the enforceability of class action arbitration waivers in employment agreements and the continued viability of the California Supreme Court's decision in *Gentry v. Superior Court* (2007) 42 Cal.4th 443 (*Gentry*) have been hotly debated and are the subject of numerous appellate decisions.  (See maj. opn. *ante*, fn. 7.)  In *Truly Nolen of America v. Superior Court* (2012) 208 Cal.App.4th 487 (*Truly Nolen*), this court traced the history and analytical underpinnings of the *Concepcion* and *Gentry* decisions, and concluded that *Concepcion* "implicitly disapproved the reasoning of the *Gentry* court . . . ," but we declined to "disregard [*Gentry*] without specific guidance from our high court."  (*Truly Nolen, supra*, at p. 507.)  We also held "the factual analysis as to whether the [four] *Gentry* factors apply in any particular case must be specific, individualized, and precise."  (*Id.* at p. 511.) Applying this standard, we determined the employer failed to present sufficient evidence to satisfy the *Gentry* factors.

I adhere to our court's decision in *Truly Nolen* to apply *Gentry* until such time as our Supreme Court directs otherwise.  Inasmuch as our high court has granted review on this specific issue (*Iskanian v. CLS Transportation of Los Angeles, LLC* (2012) 206

Cal.App.4th 949, review granted Sept. 19, 2012, No. S204032), I believe the approach in *Truly Nolen* is particularly appropriate. However, I concur in the majority's reversal in this case because I conclude that the evidence plaintiff offered in this case in support of the *Gentry* factors did not meet the criteria set forth in *Gentry* and *Truly Nolen.*

                                                      _____

                                                                  HALLER, J.